JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Andrew Burgess

**DEFENDANTS**

Central Bucks School District, Abram M. Lucabaugh

**(b)** County of Residence of First Listed Plaintiff   Philadelphia County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Bucks County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Eli Segal, LeVan Stapleton Segal Cochran LLC, 1760 Market Street, Suite 403, Philadelphia, PA 19103 (215) 402.6555

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [x] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983; 20 U.S.C. § 1681, et seq.

Brief description of cause:
Retaliation against Plaintiff in violation of his civil rights

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE      DOCKET NUMBER

DATE
Apr 11, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Eli Segal

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ Andrew Burgess, 250 Parker Avenue, Philadelphia PA 19128 _____

Address of Defendant: _____ Central Bucks School District, 20 Welden Drive, Doylestown, PA 18901 _____

Place of Accident, Incident or Transaction: _____ 20 Welden Drive, Doylestown, PA 18901 _____

---

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 04/11/2023 _____  _____  205845

         *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

| | | |
|---|---|---|
| **A.** | **Federal Question Cases:** | **B.** | **Diversity Jurisdiction Cases:** |

*A. Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☑ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   *(Please specify):* _____

*B. Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury *(Please specify):* _____
7. ☐ Products Liability
8. ☐ Products Liability – Asbestos
9. ☐ All other Diversity Cases
   *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Eli Segal _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: 04/11/2023 _____  Sign here if applicable  205845

         *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANDREW BURGESS,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>CENTRAL BUCKS SCHOOL DISTRICT, ABRAM M. LUCABAUGH, in his official and individual capacity,<br><br>　　　　　Defendants. | Civil Action No:<br>Jury Trial Demanded |

**COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 4

PARTIES ........................................................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................ 6

    A.    CBSD's Increasingly Hostile Environment for LGBTQ+ Students ...................... 6

    B.    Defendants Were Aware of Anti-LGBTQ+ Bullying in CBSD in General and Against Student A in Particular ............................................................................ 7

    C.    Andrew Burgess's Career with the District and History of Advocacy and Reporting....................................................................................................................... 9

    D.    At the Request of Student A and His Family, Burgess Files a Complaint with OCR about the Persistent, Unaddressed Bullying that Student A Continued to Experience ............................................................................................................ 11

    E.    Burgess's Advocacy Related to CBSD's Classroom Library Policies ................ 15

    F.    CBSD Administration Criticize Burgess for His Advocacy................................. 17

    G.    Additional Issues Arise Related to CBSD Policies Impacting LGBTQ+ Students.................................................................................................................. 18

    H.    CBSD Suspends Burgess ..................................................................................... 19

    I.    After Burgess's Suspension, Defendants Take No Discernible Action to Address the Bullying that Student A Was Experiencing ...................................................... 25

    J.    CBSD Involuntarily Transfers Burgess ............................................................... 26

    K.    The ACLU Submits an OCR Complaint that References Burgess and His Experiences.......................................................................................................... 28

    L.    Additional Retaliatory Acts by Defendants ........................................................ 29

    M.    CBSD Is Responsible for the Retaliation Burgess Suffered, and Punitive Damages Are Warranted Against Lucabaugh ...................................................................... 30

CAUSES OF ACTION .................................................................................................... 31

PRAYER FOR RELIEF .................................................................................................. 33

## INTRODUCTION

Teacher Andrew Burgess advocated for the safety, welfare, and inclusion of LGBTQ+ students. For that, Central Bucks School District ("CBSD" or the "District") retaliated against him. The District suspended him and then involuntarily transferred him from the school where he had taught for fourteen years. The retaliation continues. Therefore, Burgess brings claims under the First Amendment to the United States Constitution and Title IX of the Education Amendments of 1972 ("Title IX"),[1] and, among other relief, seeks declaratory and injunctive relief and damages.

From August 2006 until May 2022, Burgess was an eighth-grade social studies teacher at Lenape Middle School ("Lenape"). Throughout his career, but especially in recent years, Burgess has been a fierce advocate for students. He has participated in committees and community meetings, applied for grants, met with students and families, and lobbied his administration, in an effort to create a safe environment for all students at his school and to support good policy throughout the District.

Burgess's work, on behalf of both students and the community, put him in conflict with CBSD administration. Over the last few years, LGBTQ+ students have faced severe bullying at Lenape and other schools in CBSD. Despite being aware of this bullying, CBSD has not taken adequate steps to counter it. In fact, new members of the Board of School Directors of CBSD

---

[1] Title IX prohibits discrimination in educational programs on the basis of sexual orientation or gender identity by recipients of federal funds. *See e.g.*, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) ("It is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."); Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32637 (Jun. 22, 2021), available at https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf. When a funding recipient retaliates against a person because he complains of discrimination that violates Title IX, this retaliation itself constitutes illegal discrimination under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

("School Board" or "Board") who were elected in 2021 have put in place policies that have worsened the environment for LGBTQ+ members of the student body. In this context, Burgess was involved in two particular efforts to support LGBTQ+ students that caused CBSD to begin a series of retaliatory actions against him.

The first issue began in the fall of 2021, when Burgess became aware of CBSD's efforts to potentially remove LGBTQ+-themed material, and other content that was purportedly inappropriate for students, from classroom libraries. Burgess expressed concerns to members of CBSD administration about these efforts. Then, in late-March 2022, when Lenape Principal Geanine M. Saullo sought to meet individually with each teacher who maintained a classroom library, Burgess advocated for a group meeting instead. Burgess was concerned that the individual meetings could lead to the removal of books—or even staff—from the school and thought that a group meeting would help ensure that all teachers receive the same information regarding any library censorship directives.

The second issue arose when a transgender student ("Student A") provided Burgess a long list of anti-LGBTQ+ bullying incidents he had experienced. Student A previously reported his bullying to Lenape administration on multiple occasions, but the administration never took action that improved his situation. At Student A's and his family's request, Burgess filed a complaint against CBSD with the U.S. Department of Education's Office for Civil Rights ("OCR") in late-March 2022. The complaint alleged illegal discrimination in violation of Title IX based on the experiences of Student A and CBSD's failure to protect LGBTQ+ students like Student A from this kind of bullying.

On May 6, 2022, Defendants suspended Burgess from his job in retaliation for his protected advocacy. Prior to his suspension, Burgess was called into a disciplinary meeting in April 2022,

where CBSD administration, particularly Defendant Superintendent Abram M. Lucabaugh, sharply criticized Burgess for his actions regarding CBSD's classroom library censorship efforts and his reporting of Student A's bullying to OCR. When Burgess was ultimately suspended, CBSD's suspension letter referred to these two incidents as the reasons for the suspension. The letter inaccurately accused him of deliberately violating an unnamed protocol, informed him that CBSD was conducting an investigation, and stated that CBSD might terminate his employment.

On that day, CBSD officials told Burgess that he was required to leave the school immediately, that he was not permitted to return, and that he was prohibited from speaking to any of his colleagues. CBSD also confiscated his laptop, instructed him to gather his belongings, and escorted him through the hallways and eventually out of the school in the middle of the day in full view of his colleagues and students. Five days later, Burgess filed another OCR complaint, asserting that CBSD had retaliated against him for filing his initial OCR complaint about the unaddressed anti-LGBTQ+ bullying of Student A.

A few months later, Defendants continued their pattern of retaliation by involuntarily transferring Burgess to a different school. With only seven days to go before the start of the 2022–2023 school year, Superintendent Lucabaugh told Burgess that he was being transferred involuntarily from his position as an eighth-grade teacher at Lenape, which he had held the last fourteen years, to a position as a seventh-grade teacher at Unami Middle School. The transfer was inconsistent with the transfer procedures set forth in the applicable collective bargaining agreement. Moreover, Defendants not only transferred Burgess involuntarily, but also assigned him to teach content he had not previously taught, and to do so to more students than he had ever taught before—a significant workload increase. After starting his new position, Burgess learned

of another retaliatory action he believes the Defendants took during the summer, but does not provide further details of that action at this time due to potential legal obligations of confidentiality.

On October 6, 2022, the ACLU of Pennsylvania submitted a separate complaint to OCR on behalf of seven transgender and non-binary students, alleging that CBSD's chronic failure to take reasonable and necessary measures to address persistent and severe bullying and harassment of LGBTQ+ students resulted in a hostile environment for LGBTQ+ students generally, and gender non-conforming students in particular, in violation of Title IX and the Equal Protection Clause of the Fourteenth Amendment. The complaint repeatedly referenced Burgess and the retaliation that he experienced, making it clear that he had cooperated with the ACLU.

After the filing of the ACLU's complaint, Defendants have continued to retaliate against Burgess. Burgess does not plead those retaliatory actions with specificity at this time due to a directive by his employer, CBSD, not to discuss certain matters. However, Burgess fears that CBSD may even attempt to place blame for the poor treatment of LGBTQ+ students on him and other teachers who have been these students' strongest, and sometimes only, advocates.

Defendants' actions have chilled the speech of Burgess and other CBSD staff and teachers, discouraged them from advocating for LGBTQ+ students, and created an environment of fear among students and faculty that they too will suffer retaliation if they stand up to CBSD's Board majority or Superintendent Lucabaugh.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

2.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to this action occurred in the District, and the parties either reside or are subject to personal jurisdiction in the District.

## PARTIES

3.      Plaintiff Andrew Burgess is an adult resident of the Eastern District of Pennsylvania. He is an employee of Central Bucks School District.

4.      Defendant Central Bucks School District ("CBSD" or "the District") is a school district within the Commonwealth of Pennsylvania organized pursuant to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 Pa. Stat. §§ 1-101, *et seq*. The District's headquarters and principal place of business is located at 20 Welden Drive, Doylestown, PA 18901. CBSD has approximately 18,000 students and is the fourth largest school district in Pennsylvania. CBSD has 15 elementary schools (grades K-6), 5 middle schools (grades 7-9), and 3 high schools (grades 10-12). The District is a person acting under color of state law for the purposes of 42 U.S.C. § 1983. The District receives federal funds from the U.S. Department of Education and is subject to Title IX of the Education Amendments of 1972, which prohibits sex discrimination against any person in any education program or activity receiving Federal financial assistance. The Board of School Directors of Central Bucks School District ("School Board" or "Board") is the governing body of CBSD.

5.      Defendant Dr. Abram M. Lucabaugh is the Superintendent of CBSD and is the highest-ranked employee at the District. He is sued in his official and individual capacity. As superintendent, Lucabaugh had authority from the District to recommend to the Board certain employment actions, including, but not limited to hiring, firing, and transfers. As superintendent, Lucabaugh also had authority to influence and directly undertake certain employment actions,

5

including but not limited to suspending employees. Lucabaugh, who at all relevant times was acting under color of state law, had authority to take corrective action when confronted with allegations of discrimination.

## FACTUAL ALLEGATIONS

### A.   CBSD's Increasingly Hostile Environment for LGBTQ+ Students

6.      CBSD is a hostile environment for LGBTQ+ students in general, and transgender students in particular.[2]

7.      Teachers and other staff, parents, students, and health professionals have endeavored to convince the District to adopt best practices recommended by the U.S. Department of Education, the Centers for Disease Control, and others, and to provide District-wide training for faculty and staff on how to provide a safe, healthy, and supportive environment for the District's sizeable number of LGBTQ+ students. The District, however, has rejected entreaties to institute such measures that could alleviate the hostile education environment.

8.      The situation has worsened since the election of new school board members in November 2021. A six-member majority of the new board and Superintendent Lucabaugh have adopted policies and taken actions on behalf of CBSD that negatively impact LGBTQ+ students.

9.      For example, CBSD has directed teachers to remove Pride flags, deeming them inappropriate "political symbols."

10.     CBSD has directed teachers not to use transgender students' preferred names and pronouns without parental consent.

---

[2] *See generally* the ACLU of Pennsylvania's October 2022 OCR complaint against CBSD, which details the hostile environment claims. A copy of the redacted complaint can be accessed at https://www.aclupa.org/sites/default/files/field_documents/cbsd_administrative_complaint_-_final_10-6-22_redacted3.pdf.

11.     CBSD relegated a Human Growth and Development (health) class to at-home-video instruction after a non-binary child insisted on participating in the girls' class.

12.     During the 2021-2022 school year, some CBSD community members advocated for censorship of books with LGBTQ+-related content. CBSD then implemented new library and textbook policies focused on "sexualized content," an apparent effort to censor LGBTQ+-themed materials.

**B.      Defendants Were Aware of Anti-LGBTQ+ Bullying in CBSD in General and Against Student A in Particular**

13.     Anti-LGBTQ+ bullying has been rampant in CBSD for years.

14.     Such bullying has led not only to depression, anxiety, fear, and isolation among LGBTQ+ students, but also to incidents of student self-harm—including one transgender student attempting to take his life in a school bathroom in 2019.

15.     CBSD has repeatedly been made aware of this persistent problem of anti-LGBTQ+ bullying, but has never addressed it in any meaningful way.

16.     For example, early in the 2021–2022 school year, Superintendent Lucabaugh met with student members of each middle school's and high school's student organization for LGBTQ+ students and their allies.

17.     At these meetings with Lucabaugh, students identified bullying of LGBTQ+ students—particularly transgender students—as a major problem at CBSD schools.

18.     CBSD, however, failed to take any discernible remedial measures, such as proactive policies and practices to protect LGBTQ+ students or training for teachers and staff.

19.     In the same vein, one transgender student ("Student A") reported his bullying to a guidance counselor four or five times during the 2021–2022 school year, to no avail.

20.     Burgess personally walked Student A to a guidance counselor in October 2021 because he found Student A crying after being repeatedly deadnamed by another student. Deadnaming is the act of referring to a transgender or non-binary person by a pronoun or name the person used prior to transitioning, such as the person's birth name.

21.     Unsure whether the administration would address the incident, Burgess also spoke with the student who had deadnamed Student A, in the hopes of educating that student and preventing future bullying of Student A.

22.     Student A's family also reached out to the Lenape administration in the fall of 2021 regarding the bullying.

23.     Despite these repeated reports, Defendants took no discernable action to rectify Student A's troubling situation.

24.     Similarly, in February 2022, the Board, Lucabaugh, Lenape Middle School Principal Geanine Saullo, and others in CBSD received an email from a former assistant principal advising that LGBTQ+ students were experiencing terrible harassment at CBSD schools, particularly Lenape.

25.     The email reported incidents of students barking at and pushing LGBTQ+ students in the hallway, throwing objects at them, threatening to beat them, and using the "f" slur.

26.     CBSD took no discernable action to address the reported bullying in response to this email either.

27.     Moreover, in or around March 2022, members of Lenape's Sexuality and Gender Alliance student club reported widespread anti-LGBTQ+ bullying, particularly during lunchtime, and identified three primary bullies. This information was shared with the Lenape administration, including Principal Saullo, but without identifying the students who had been bullied.

28.     CBSD again took no discernable action to address these reports of bullying. The administration informed teachers that the administration could not do anything to address these bullying reports if the complaining students remained anonymous.

29.     But adopting best practices and providing staff training to help ensure a safe, healthy, and supportive environment for LGBTQ+ students would not have required knowing the identities of those who had been bullied.

**C.      Andrew Burgess's Career with the District and History of Advocacy and Reporting**

30.     Burgess began his career at CBSD in 2006, as an eighth-grade teacher at Lenape Middle School. Prior to the 2021–2022 school year, Burgess had never been formally disciplined by CBSD.

31.     Burgess's goal as a teacher is to create a learning space that is emotionally and physically safe, while also providing academically challenging work that enables student growth. In keeping with that ethos, Burgess has long been an advocate for students.

32.     In recent years, much of his advocacy has centered on issues faced by LGBTQ+ students, and he has pushed for better anti-discrimination training in CBSD on multiple occasions.

33.     For example, in 2016, Burgess applied, and was approved, for a grant by CB Cares, a local education foundation, to provide teacher trainings during the school day on diversity, equity, and inclusion ("DEI") issues.

34.     CBSD later cut ties with CB Cares after parent groups attacked the organization in part because a teacher had received a CB Cares grant to add LGBTQ+-themed books to his classroom library.

35.     In addition, in 2018, Burgess began supervising Lenape's "No Place for Hate" program, a student-led, school-climate-improvement program developed by the Anti-Defamation League.

36.     As part of the program, Burgess and other faculty formed a committee that met with student leaders to discuss concerns about the climate at Lenape. The number one issue that students shared was that transgender students were being targeted or were suffering due to lack of education on the part of students and faculty regarding deadnaming.

37.     In response, Burgess and the other members of the committee met with the Lenape administration and asked for programming on deadnaming of transgender students. In the meeting, they discussed the discrimination occurring based on LGBTQ+ status, and the effect it was having on students. The administration, including Principal Saullo, was clear that the school was not going to conduct any programming on that issue, and the request was rejected.

38.     Similarly, in March 2022, Burgess met with Lenape administration, including Saullo, to advocate for creating a gender-neutral bathroom at Lenape. The request was brushed aside because the signage might be "controversial."

39.     Burgess also attended a March 30, 2022, Transgender Day of Visibility event at the Old Bucks County Courthouse in Doylestown, in solidarity with transgender Lenape students.

40.     Burgess is also an advocate for reporting behavior issues in general in CBSD schools.

41.     Burgess participated in a committee at Lenape that implemented School Wide Positive Behavioral Intervention and Supports, which included a building-wide behavior reporting system that allowed teachers to submit a Behavior Data Report ("BDR") to document and report behavior incidents. This system was piloted at Lenape for potential use at other CBSD schools.

42.     Burgess is a prolific reporter in the BDR system and has submitted dozens of reports since it became operational a few years ago. In the past, Lenape even positively recognized Burgess as one of the school's top reporters.

43.     Under the Central Bucks Education Association's ("CBEA" or "teachers' union") collective bargaining agreement, "[w]hen an employee refers a student to Administration for the purposes of discipline, the employee shall be notified in writing by the Administration of the action taken within five (5) school days of the referral."

44.     In the BDR system, reported "major" violations were supposed to be referred to administration for discipline. Burgess regularly received no response from CBSD to major violations he reported in his BDRs. He understood that many teachers experienced the same thing, which discouraged teachers from reporting through the system.

**D.     At the Request of Student A and His Family, Burgess Files a Complaint with OCR about the Persistent, Unaddressed Bullying that Student A Continued to Experience**

45.     In February or March 2022, Burgess and a coworker attended a meeting of the Sexuality and Gender Alliance student club at Lenape to offer their support to students. Burgess decided to attend the meeting after he had seen the email sent by Lenape's former assistant principal, referred to in paragraphs 24 and 25 above.

46.     At the meeting, Burgess made clear that the teachers were concerned about the hostile environment for LGBTQ+ students described in the email. Because incidents often were not reported, Burgess explained how the BDR system worked and showed students how to get teachers to report instances of bullying through that system. One way Burgess had built trust with students in the past was by sitting with them, writing out what they experienced, and submitting the BDR in front of them.

47.     On March 3, 2022, Student A approached Burgess to discuss the bullying he was continuing to experience based on his LGBTQ+ status. (As discussed at paragraph 20 above, Burgess had previously walked Student A to the guidance office when Student A was upset about being deadnamed.)

48.     Burgess scheduled a time to meet with Student A the next day and asked him to put the bullying that he had experienced in writing. Student A then sent Burgess an email describing various incidents that had happened to him over the course of the school year. The incidents included other students deadnaming, hitting, and throwing things at Student A.

49.     Burgess was concerned about these incidents. He asked Student A whether he was thinking of hurting himself or otherwise in crisis. Student A earnestly told Burgess that he was not.

50.     In addition, Burgess determined that Student A was not describing child abuse and that the situation therefore did not trigger the reporting procedures that the law mandates teachers follow when they suspect child abuse.

51.     Burgess then spoke further with Student A about what Student A was experiencing and worked with him to put the bullying incidents into a table to facilitate reporting.

52.     Burgess told Student A he would like to report these instances through the BDR reporting system. However, Student A was not comfortable with that approach—going so far as to physically back away from Burgess when Burgess suggested reporting the incidents in this way.

53.     Student A told Burgess that he did not want to submit a report through the BDR system because it does not permit anonymous reports and would notify the bullies' parents. Student A was afraid of possible retaliation against him.

54.     While filing BDRs was Burgess's usual practice, he thought that Student A's fears may be well founded—particularly after seeing how CBSD was treating LGBTQ+ students and

DEI efforts generally. Burgess was having serious doubts that the administration was taking appropriate action to keep students safe from bullying based on LGBTQ+ status.

55.     Burgess had recently become familiar with the U.S. Department of Education's Office for Civil Rights ("OCR"). OCR's mission is to ensure equal access to education and to promote educational excellence throughout the nation through vigorous enforcement of civil rights. One of OCR's responsibilities is to receive and resolve complaints of discrimination, which can include severe and persistent bullying and harassment that constitutes a hostile educational environment.

56.      Burgess understood that filing a complaint with OCR could be a way to obtain relief for Student A, while also prompting the District to finally address the widespread discrimination and harassment based on LGBTQ+ status that was occurring at Lenape and elsewhere in CBSD.

57.     Burgess advised Student A that they could report the bullying against him through the BDR system or the OCR system. Student A told Burgess that he only wanted to make a report to OCR.

58.     On March 10, 2022, Burgess convened a meeting with Student A, his mother, and his adult sister. Burgess told Student A's mother and adult sister about the litany of bullying incidents that Student A had described to him and shared the table they had developed.

59.     In the meeting, Burgess informed Student A's mother and adult sister about the options: Burgess could submit a report to CBSD using the BDR system, and/or file a complaint with OCR. Burgess advised the family that they did not have to decide that day what approach to take. Student A and his family left with the paperwork necessary for Burgess to complete and file an OCR complaint.

60.     The day after the meeting, on March 11, 2022, Principal Saullo sent an email to several teachers, including Burgess, in which she recognized that "earlier in the year [Student A] was experiencing some negative attention from peers" and asked whether the teachers had "seen anything lately or if things have improved."

61.     Upon information and belief, Saullo sent that email because staff in her office had seen Student A's family come into the school and be greeted by Burgess the day before.

62.     Burgess replied to Saullo's email and said that Student A had "talked about some of these interactions, with [him], and they do not seem to have improved." Burgess also provided a list of students who should and should not be paired with Student A in the upcoming school year.

63.     Student A and his family eventually decided they wanted Burgess to file an OCR complaint. On March 31, 2022, Burgess received the necessary signed paperwork from Student A, completed the complaint, and mailed it to OCR. OCR received the complaint on April 13, 2022.

64.     In the complaint, Burgess alleged that CBSD committed discrimination "based on sex," specified "discrimination against a transgender student," and sought, as a remedy, "training for staff and students, particularly about equity and acceptance of LGBTQ+IA students and staff." Burgess also attached to the complaint the spreadsheet of incidents that he and Student A had created.

65.     As requested by Student A's family, Burgess did not give OCR consent to reveal the student's identity.

66.     Upon information and belief, as the family was filling out the OCR complaint paperwork, they called the CBSD main office to ask questions about how to properly complete the paperwork, thereby informing CBSD that an OCR complaint was forthcoming.

14

67.     As described further below, CBSD would later suspend Burgess, stating that the above course of events showed a "dereliction of [his] obligations to [Student A] and parents of [Student A] . . . as well as a deliberate failure to follow the proper protocol so that the administration could address and rectify these bullying conditions."

### E.      Burgess's Advocacy Related to CBSD's Classroom Library Policies

68.     Before and during the 2021–2022 school year, some CBSD community members and a newly elected board majority advocated removing purportedly inappropriate books from CBSD schools, with LGBTQ+-themed books as the apparent primary target.

69.     In the summer of 2021, a middle school teacher's LGBTQ+-themed classroom library became a target of attack by community members after someone anonymously posted photos of the library online. Rather than supporting the teacher, District administration made him feel that he had done something wrong and subjected him to an audit of his classroom library to determine if it contained "inappropriate" material. Although CBSD did not identify any inappropriate material, the administration's response to the attacks had an intimidating effect on that teacher and on other teachers with classroom libraries.

70.     The Board would eventually pass new library and textbook policies focused on "sexualized content" in the summer of 2022, which has since been used to target LGBTQ+-themed books.

71.     Against this backdrop, Burgess met with District administration twice during the school year to discuss the policies then under consideration and to relay teachers' concerns about them. As conveyed to Burgess, teachers were confused about the policies and were fearful that they could be subject to discipline for having LGBTQ+-themed books in their classroom libraries. In addition, Burgess felt the issue was one of broader public importance about censorship and LGBTQ+ discrimination.

72.     On March 23, 2022, Saullo emailed teachers at Lenape asking them to see her individually if they had a classroom library.

73.     The email triggered concerns for Burgess that such individual meetings could lead to adverse disciplinary consequences for teachers and to the removal of books from the school.

74.     Burgess shared his concerns with a group of teachers, many of whom agreed—particularly given the climate of fear that the new School-Board majority had created in connection with LGBTQ+-related issues.

75.     In his role as a union representative, Burgess sent an email reply to Saullo, requesting that the administration meet with the teachers as a group, rather than individually. A group meeting would help ensure that all teachers received the same information regarding any library censorship directives—a matter of substantial public concern. Burgess's group meeting request was denied.

76.     When Burgess followed up with Saullo about the individual meetings that she had requested, Saullo responded that teachers were free to meet with her alone, with union representation, or not at all. Burgess then relayed those options to the teachers.

77.     That same day, March 24, 2022, during a pre-scheduled labor-management meeting between the CBEA and CBSD, which Lucabaugh and Saullo attended, concerns arose about the classroom libraries. Burgess asked a question about who was in charge of what was deemed appropriate under the policies being considered by the District. Lucabaugh, visibly angered, sternly and dismissively retorted something to the effect of, "you know what we are talking about."

78.     At least one faculty member contacted local media to share concerns about the climate of increasing fear among teachers regarding their classroom library collections. During a

faculty meeting a few days after the media reported on these concerns, Saullo expressed her displeasure with the responses to the book policies, referenced the news story, and blamed the faculty for causing a panic about the issue.

### F.   CBSD Administration Criticize Burgess for His Advocacy

79.     Soon thereafter, Burgess received an email from CBSD scheduling a meeting with him to address "concerns."

80.     The meeting took place on Tuesday, April 19, 2022. Lucabaugh, Human Resources Director Andrea DiDio Hauber, Saullo, and CBEA President Bill Senavaitis were all present.

81.     During the meeting Lucabaugh, DiDio Hauber, and Saullo criticized Burgess for his actions related to the classroom library issue.

82.     At some point in the meeting, Lucabaugh switched topics, stated that "now this is the part I really want to talk about," and told DiDio Hauber to make sure that she was writing this down.

83.     Lucabaugh asked Burgess if he knew that he was a "mandated reporter," and Burgess replied acknowledging that he is.

84.     Recognizing that this line of inquiry might be related to his OCR complaint, Burgess stated that he had made a report to OCR. He explained that the bullying incidents raised in his OCR complaint were not subject to mandatory reporting requirements because they did not qualify as child abuse.

85.     Burgess's admission that he had filed an OCR complaint elicited a fiery back and forth with Lucabaugh.

86.     While Burgess did not reveal Student A's identity during the discussion of the OCR complaint, Saullo read aloud Burgess's response to the email that she had sent on the day after he

had met with Student A's family, suggesting that she knew exactly which student was the subject of the OCR complaint.

87. The meeting lasted about ninety minutes.

88. Burgess left in a state of panic. He was terrified and deeply angry. He was concerned that CBSD was targeting him and might fire him.

89. For the next few weeks, Burgess heard nothing more from the administration about any of the issues discussed at the April 19, 2022 meeting.

**G.    Additional Issues Arise Related to CBSD Policies Impacting LGBTQ+ Students**

90. On May 3, 2022, Saullo sent an email indicating that students who wanted to use a different name or pronoun—often the case with transgender students—would need to follow a formal process beginning in the guidance office.

91. The next morning, Burgess informed several students he thought would be impacted by the new process. They went to the guidance office to inquire further.

92. That same morning, Student A's adult sister contacted the guidance office to complain about the new policy. Soon thereafter, Student A was summoned to the guidance office, where he was asked how he learned about the new policy. Student A replied that Burgess had told him. No one from the guidance department asked Student A whether he had concerns about the policy; they only wanted to know the source of his information.

93. Shortly thereafter, Saullo and Lenape Assistant Principal Lauren Dowd questioned Burgess during his lunch break about why he had sent students to the guidance office.

94. The next day, on May 5, 2022, Student A's sister emailed Lenape administration criticizing the decision to pull her brother from class to ask how he found out about the policy as "*wildly* inappropriate." She also complained that she was "beyond frustrated with how the school

is treating [Student A] and making light of every single instance of bullying and harassment that has taken place during this school year" and stressed that Burgess was "the *only* faculty member to provide any assistance in dealing with this relentless bullying."

95.     That same day, May 5, Student A reached out to Burgess again and described two additional instances of bullying. After being criticized at the April 19 meeting for reporting to OCR, Burgess asked for Student A's consent to directly email Saullo and Dowd, which Student A gave, and Burgess emailed them that afternoon.

96.     The next morning, May 6, 2022, one of the students who had bullied Student A was called from Burgess's class to the Lenape main office. When that student quickly returned to class, Burgess heard the student tell others something to the effect that the administration did not need him anymore because circumstances had changed. Very shortly thereafter, Burgess would learn how profoundly circumstances—notably his own circumstances—had changed.

**H.     CBSD Suspends Burgess**

97.     Later on May 6, at about 11:30 a.m., Saullo summoned Burgess to the Lenape main office conference room.

98.     Already present in the conference room when Burgess arrived were Lucabaugh, Saullo, DiDio Hauber, and Zach Marttila, a union representative.

99.     DiDio Hauber handed Burgess a letter, directed him to read it and declared that the administrators would not discuss it with him or answer any questions.

100.    Burgess read the letter, which stated as follows:

The purpose of this correspondence is to delineate issues that have been investigated with respect to your responsibilities concerning a student that has been bullied in your school. The investigation has included speaking to you as well as information provided from the parents of the child. What the investigation has revealed to date is that a child in your school has suffered multiple incidents of bullying by one or more students in your school. Not only were you aware of the situation, but you directed the child and the parents not to report the incidents to the

principal, claiming that the administration would not do anything to alleviate the situation.

The investigation is continuing, but what has been revealed to date indicates a dereliction of your obligations to the child and parents of the child in your school, as well as a deliberate failure to follow the proper protocol so that the administration could address and rectify these bullying conditions. Indeed, your actions may have been responsible for the continuation of the bullying suffered by the student.

While this investigation continues, you are hereby suspended from all duties with the District. You may not enter District property without permission of the Superintendent or the Superintendent's designee. The suspension, at this time, is with pay. At the conclusion of the investigation, you will be advised what discipline will be meted out to you, which discipline may include suspension and/or termination of your employment.

If you have any questions regarding the terms of your current suspension, please contact Andrea DiDio Hauber, Director of Human Resources. If at some point you need to obtain personal materials from your classroom, please contact Ms. DiDio Hauber and she will make arrangements with the Principal to have you receive such personal items.

In addition to the above situation, it has also been brought to the attention of the Principal that you directed teachers in your building not to speak to the Principal who needed to confer with teachers with respect to issues of appropriate reading materials being made available to students. The purpose of the conversation was to inform the teachers as to the District policy with respect to such materials and was not in any way a disciplinary hearing. It has been reported that you advised teachers not to have such conversations with the Principal and "not to cross Union lines", whatever that may mean.

Your actions in trying to direct teachers to engage in concerted activity would have been a violation of their obligations, not only under the collective bargaining agreement, but also under law. The focal point is that you tried to direct them into this improper activity. Again, this is part of the current investigation, and you will be advised as to what consequences will flow from your improper actions.

Please let me know if you have further questions at <u>adidio@cbsd.org</u>.

Sincerely, Andrea L. DiDio Hauber, Director of Human Resources

    101.    Thus, the letter set out two reasons for the suspension: that Burgess purportedly did not report the bullying that Student A had experienced, and that he allegedly told teachers not to speak to the principal about their classroom libraries.

102.    The letter is inaccurate in multiple ways, including the following:

a.    While CBSD maintains a policy prohibiting bullying in the District Policy Manual at Section 200, Code 249 ("Policy 249"), Policy 249 does *not* mandate that teachers report bullying, and does not even provide any guidelines for reporting bullying. Indeed, the District did not identify this policy or any other policy in the suspension letter, and has never identified which policy or protocol Burgess allegedly violated, because none exists.

b.    Burgess *did* report the bullying of Student A—he did so to OCR.

c.    Burgess did *not* direct Student A or his family not to tell the administration about the bullying. Burgess gave them the choice, and they told him that they did not want to report through the BDR system and wanted to file a complaint with OCR.

d.    Instead of being the cause of Student A's bullying, Burgess was a safe haven for Student A after the administration did nothing discernible throughout the year in response to Student A's repeated complaints about bullying or in response to the bullying of other LGBTQ+ students.

e.    Burgess did *not* direct teachers not to speak to Principal Saullo about their classroom libraries, but instead conveyed to them what he understood to be their options, based on what Saullo had told him. Burgess never told teachers "not to cross Union lines."

103.    The letter's alleged reasons for the suspension are pretextual. There was no legitimate reason for suspending Burgess. CBSD was instead retaliating against Burgess and endeavoring to construct a basis to intimidate him and others to prevent them from challenging CBSD's anti-LGBTQ+ policies, while distracting attention from CBSD's failures to abide by its responsibility to provide a safe and supportive learning environment for *all* students.

104.    DiDio Hauber, on behalf of CBSD, then ordered Burgess to have no contact with any students or colleagues, and to turn over his laptop and employee badge. She advised him that everything in his room was being seized.

105.    Assistant Principal Dowd and union representative Marttila then escorted Burgess back to his classroom to collect his personal belongings.

106.    Because school was still in session, anyone who was in the hallway would have witnessed Burgess being escorted back to his classroom.

107.    Cognizant of the directive that he not speak with anyone, Burgess awkwardly refused to respond to anyone who greeted him as he walked by.

108.    Burgess gathered the few items he was permitted to take from his classroom, leaving treasured notes from students, money, correspondence (including copies of the OCR complaint), class lessons, and sensitive union documents.

109.    Burgess was then escorted back into the hallway and out of the building.

110.    Students and teachers in classrooms with windows that looked out on the parking lot were able to see that Burgess was outside.

111.    CBSD's decision to escort Burgess through the hallways and out of the building during the middle of the school day was highly unusual. Generally, only personnel who pose an imminent safety threat to students or others are treated so harshly.

112.    The widespread attention to the incident led to unfounded rumors about Burgess, including that he had an inappropriate relationship with a student.

113.    Upon information and belief, no other teacher has been suspended or otherwise disciplined for a failure to report bullying to the administration. While Burgess was an active

reporter of bullying through the BDR system and otherwise, many teachers in his school were not. Many bullying incidents were occurring and going unreported.

114.    On May 11, 2022, Burgess filed a second complaint with OCR, this time alleging that CBSD retaliated against him over the filing of the March OCR complaint.

115.    Burgess's suspension created a backlash among members of the CBSD community, many of whom believed that CBSD suspended Burgess because of his advocacy for LGBTQ+ students.

116.    On May 10, 2022, a group of students did not report to their morning classes and assembled outside Lenape to demonstrate their support for Burgess.

117.    That night, the Board held its first meeting since Burgess's suspension. Lucabaugh made unscheduled comments acknowledging the pervasive bullying against LGBTQ+ students but offering no action to remedy it. He called on adults to "do better" but neither he, nor the Board, took any concrete actions or suggested any policy changes to improve the environment for LGBTQ+ students. Rather, Lucabaugh criticized "narratives" in the community critical of CBSD's policies regarding pride flags, changes to the Human Growth and Development class, and suspension of a teacher (i.e., Burgess).

118.    At the meeting, several students also spoke on the record against CBSD's suspension of Burgess. One student stated:

> At the beginning of the year, I came out as trans. I told all my teachers. I told them my name and my pronouns, and that they were only to refer to me as those. All of them were accepting of it. They didn't really care. However, the 8th grade student body seemed to have a different opinion on that. I've been constantly harassed. I've been bullied. I've had people yell in my face. I've had people call me a myriad of slurs. I've had things thrown at me, etcetera. One time, I had someone call me names that I would prefer not to repeat, and told me that they were going to assault me.

Every time after this, I would go to guidance. I was always told that they were my safe space, that they were supposed to help me. That they wanted to help me. That they were the people that were supposed to make me feel safe. Every time I would go to guidance, I was always told things that were along the lines of 'they're just immature,' 'they'll grow out of it,' 'it's just MUD [i.e., made up drama].' Every time I walked out of that counselor, I never felt safe. I never felt validated. I just felt . . . the exact same thing I felt when I was getting called slurs. I felt bullied. I didn't feel like I was cared for.

One time, I decided to go a different route. I told Mr. Burgess that a kid had deadnamed me, that he was misgendering me. And he was on top of it. He knew exactly what to do. He knew how to help me, and he knew how to support me. He asked me how I wanted to be supported, instead of throwing these things, saying that they're just immature, that they don't know what they're doing. He wanted me to feel safe.

After months and months of feeling invalidated, of feeling weird in my own skin, after feeling like I'm the problem, and that everyone else is the real person and that I'm just wrong, I finally felt ok. So I stopped going to guidance and I went to Mr. Burgess. Time and time again after getting called so many names, after getting so many threats, things thrown at me, being touched, I went to Mr. Burgess and he knew what to do. He knew how to help me. He asked me how I wanted to be helped. And I finally after the entire year of feeling like no one cared about me, had a safe space.

And then, on May 6, at 11:30-ish, Mr. Burgess got a letter saying that he was suspended. And at that exact same time, I lost one of the only people that has ever really cared for me. That really wanted to stay by my side and help me. That actually wanted to get things done instead of letting things slide. I lost the only person that really cared about me as a person.

119.    In subsequent days, students and community members continued to protest CBSD's treatment of Burgess, including by demonstrating outside of Lenape during school hours, honking car horns and waving signs, and organizing a day of silence.

120.    Lucabaugh, in conjunction with Board President Dana Hunter, issued a statement to the entire school community, including parents, calling the protests occurring at Lenape an "abomination," and describing the "narrative" about Burgess's suspension as "inflammatory." While he wrote that he could not comment on employment matters, Lucabaugh stated that staff

"must adhere to a process for reporting potentially harmful events and situations," insinuating that CBSD had suspended Burgess for failing to protect students.

**I.   After Burgess's Suspension, Defendants Take No Discernible Action to Address the Bullying that Student A Was Experiencing**

121.   Despite Defendants' claim that Burgess's failure to report Student A's bullying prevented Defendants from "address[ing] and rectify[ing] these bullying conditions," and "may have been responsible for the continuation of the bullying suffered by the student," neither Defendants nor any other District administrators appear to have tried thereafter to address Student A's difficulties.

122.   Prior to Burgess's suspension, one teacher told Saullo in response to her March 11 email about Student A, described in paragraph 60, that Student A was experiencing harassment throughout the school, including other students barking at him, and named some of the perpetrators. To Burgess's knowledge, the District did not take action based on this report.

123.   In May 2022, after the District suspended Burgess, nobody from CBSD administration followed up with Student A or Student A's family to discuss how the school could provide support and best address the problems.

124.   Indeed, Student A's situation became even worse after Burgess's suspension.

125.   The cafeteria has long been a place where student-on-student bullying and harassment of vulnerable students is at its zenith.

126.   Over the past several years, CBSD has refused repeated entreaties by counselors and teachers, including Burgess, to provide training to help support LGBTQ+ students—training that would have included the aides who typically monitor the cafeteria. Incidents of bullying and harassment are a daily occurrence in eating spaces, making Student A—and many other LGBTQ+ students—feel unsafe.

127.    After Defendants suspended Burgess in early May 2022, Student A (and other trans students at Lenape) stopped going to eat in the cafeteria for the remainder of the school year. The cafeteria was where Student A felt least safe from bullying and harassment, and after Burgess's suspension, the hostility towards him and other transgender students worsened.

128.    For the remainder of the school year, Student A spent lunchtime at the guidance office—not to meet with a guidance counselor, but to escape from bullying and harassment in the cafeteria.

129.    During this time, Saullo walked by Student A sitting in the guidance office at lunch. Neither Saullo nor anybody else from the administration asked Student A why he was coming to the guidance office every day at lunchtime.

130.    Nor did the administration act to stop the bullying in September 2022, when counselors discovered that Student A had been eating lunch in bathroom stalls for the first two weeks of the school year to avoid the lunchtime bullying and harassment.

131.    Rather, counselors told Student A he could not eat in the bathroom and offered him a cubicle in the hallway outside the lunchroom.

132.    District and Lenape officials took no apparent measures to address the toxic environment in the cafeteria that frightened Student A, and that continues to afflict other LGBTQ+ students.

### J.    CBSD Involuntarily Transfers Burgess

133.    Burgess did not hear from CBSD for over three months after his suspension. During that time, he did not know whether he would have a job when school resumed and studied to become certified to teach sixth grade in case he had to seek a new job.

134.    In late July, CBSD contacted the CBEA to request that Burgess sign a "Discharge Warning."

135.    Burgess disagreed with all of the charges in the "Discharge Warning" and, through the union, requested changes to the language. He also asked that he be able to return to Lenape as a condition for signing the "Discharge Warning."

136.    On August 18, 2022—seven days before the start of the school year—Burgess was called into the District office to meet with Lucabaugh.

137.    When Burgess arrived, he was given a revised "Discharge Warning," which contained the same language as the initial version he had received, but added a statement that "Burgess contests these charges."

138.    While Burgess still did not want to sign the "Discharge Warning," he believed that CBSD would terminate his employment if he did not do so—something that he and his family could not afford. Therefore, despite disagreeing with its contents, he signed the document.

139.    Also at the meeting, Lucabaugh told Burgess that CBSD was transferring him to Unami Middle School and assigning him to teach seventh grade social studies—even though he had taught eighth grade social studies at Lenape for the past fourteen years.

140.    Burgess did not want to switch schools and told that to Lucabaugh.

141.    Burgess's involuntary transfer was inconsistent with the transfer procedures set forth in the collective bargaining agreement.

142.    Upon information and belief, since Burgess started in 2006, CBSD has not transferred any other teacher for a purported failure to report bullying.

143.    The School Board approved Burgess's transfer at its September 13, 2022, Board meeting, with an effective date of August 23, 2022.

144.   The involuntary transfer—one week before the start of school and to a different grade with unfamiliar content—forced Burgess to spend significant time learning a new curriculum and preparing new lesson plans.

145.   Moreover, once the new school year began, Burgess realized that CBSD had assigned him more students than he ever had in his fourteen years of teaching, and more than any other seventh grade social studies teacher at Unami. Burgess estimates that the new position and larger class sizes generated an additional four hours of work per week.

146.   All in all, the switch from a familiar environment where he had developed relationships and mastered his assigned subject matter over the course of fourteen years to a new school and a new grade level was extremely difficult for Burgess.

147.   Defendants did not transfer Burgess for any legitimate educational reason. Rather, the change in terms and conditions of his employment constituted retaliation against Burgess over his advocacy on behalf of students and teachers, including his filing of the OCR complaints.

**K.    The ACLU Submits an OCR Complaint that References Burgess and His Experiences**

148.   On October 6, 2022, the American Civil Liberties Union of Pennsylvania ("ACLU") filed a complaint with OCR and the U.S. Department of Justice on behalf of seven transgender and non-binary students, including Student A, against CBSD.

149.   The complaint made the following claims:

> The basis of this complaint is discrimination based on sex that violates Title IX of the Educational Amendments Act of 1972, 20 U.S.C. §1681-§1688, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The illegal discrimination includes Central Bucks School District's chronic failure to take reasonable and necessary measures to address persistent and severe bullying and harassment of LGBTQ+ students, which has resulted in a hostile environment for LGBTQ+ students generally, and gender non-conforming students in particular. More recently, a school board majority elected in November 2021, joined by complicit upper-level administrators, have exacerbated the hostile environment by

28

making homophobic and transphobic statements, enacting blatantly discriminatory practices and policies targeting LGBTQ+ students, and retaliating against teachers and staff who support LGBTQ+ students.

150.   The ACLU's OCR complaint references Burgess's two OCR complaints, his suspension, the student protest in response to his suspension, and information describing his communications with CBSD. Based on the content included, it would have been obvious to the Defendants that Burgess had cooperated with the ACLU in the preparation of its complaint.

151.   On November 15, the Board voted 6-3 to hire a Philadelphia law firm "to represent Central Bucks School District ('CBSD') in connection with the administrative complaint filed against CBSD with the US. Department of Justice ('DOJ') and the U.S. Department of Education ('ED') by the American Civil Liberties Union of Pennsylvania relating to alleged violations of Title IX of the Educational Amendments Act of 1972 ('ACLU complaint')" and "two similar complaints filed against CBSD with ED before the ACLU complaint." Upon information and belief, the "two similar complaints" are the ones filed by Burgess.

**L.     Additional Retaliatory Acts by Defendants**

152.   Defendants have taken additional retaliatory actions against Burgess that violate his rights under both the First Amendment and Title IX.

153.   Shortly after Defendants transferred Burgess to Unami Middle School in late August, Burgess became aware of another substantial retaliatory act that he believes was ordered, directed, or authorized by Defendants. Due to potential legal constraints on disclosure, Burgess does not detail that act here. Upon information and belief, however, Defendants are fully aware of the act.

154.    In January 2023, CBSD retaliated further against Burgess leading up to and during his interview by CBSD's counsel in the District's investigation of the OCR complaints referenced in paragraph 151.

155.    Burgess is unable to detail those acts either, because CBSD ordered him not to discuss the interview.

**M.    CBSD Is Responsible for the Retaliation Burgess Suffered, and Punitive Damages Are Warranted Against Lucabaugh**

156.    Lucabaugh was aware of Burgess's advocacy on behalf of LGBTQ+ students and his involvement in OCR complaints.

157.    Upon information and belief, as a policymaker for CBSD, Lucabaugh ordered, directed, authorized, and/or affirmatively caused Burgess's suspension. Lucabaugh possessed the final authority to suspend Burgess.

158.    Upon information and belief, if Lucabaugh needed authority from the Board to suspend Burgess, the Board approved the decision.

159.    Upon information and belief, Lucabaugh ordered, directed, authorized, and/or affirmatively caused Burgess's transfer from Lenape to Unami, where Burgess was required to teach a new grade level.

160.    At all times relevant to this Complaint, Lucabaugh was acting within the scope of his employment with CBSD.

161.    Based on all the circumstances alleged herein, Lucabaugh acted with malicious intent and/or was recklessly or callously indifferent to Burgess's federally protected rights.

162.    Upon information and belief, the Board was aware of Burgess's advocacy on behalf of LGBTQ+ students and his involvement in OCR complaints.

163.    The Board, which is a policymaker for CBSD, ratified Burgess's transfer at its September 13, 2022, Board Meeting.

164.    The Board voted to hire the law firm to conduct the investigation of the ACLU's OCR complaint and the "two similar complaints" filed against CBSD. The Board is responsible for directing the law firm's investigation into those complaints. That investigation has included additional actionable retaliatory acts against Burgess.

165.    To the extent other employees of CBSD were involved in the actions taken against Burgess, such as Principal Saullo, such involvement was in the scope of their employment with CBSD and, where applicable, as a policy maker for CBSD.

166.    Moreover, Lucabaugh and CBSD's actions described herein were taken as part of a broader policy of CBSD and ratified by the Board.

## CAUSES OF ACTION

### COUNT I

**Violation of 42 U.S.C. § 1983**
**Based on Deprivation of Plaintiff's Rights under the First Amendment to the United States Constitution against All Defendants**

167.    Plaintiff re-alleges and incorporates the facts and allegations contained in all prior paragraphs as fully set forth herein.

168.    As described above, Plaintiff engaged in activity protected by the First Amendment, including, but not limited to, advocating for LGBTQ+ students on multiple occasions, filing and getting involved in complaints filed with OCR, and generally speaking out on issues of public importance.

169.    Defendants retaliated, and are continuing to retaliate, against Plaintiff for his protected activity in violation of his rights under the First Amendment to the U.S. Constitution,

made applicable to CBSD by the Fourteenth Amendment. This retaliation has subjected and continues to subject Burgess to deprivation of rights under the Constitution of the United States, entitling Burgess to redress from Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983.

170.    Defendants' retaliatory acts include suspending Plaintiff from teaching, involuntarily transferring him to a different position, and additional acts referenced herein but not detailed at this time because of potential disclosure limitations.

171.    These acts are sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.

172.    Plaintiff has suffered a diminution of his First Amendment rights, which cannot fully be compensated by money damages.

173.    Plaintiff has suffered and will continue to suffer economic and reputational harm as a result of the Defendants' unconstitutional actions.

174.    Defendants acted under color of state law in retaliating against Plaintiff.

175.    Defendant CBSD is responsible for the unconstitutional retaliation against Plaintiff because the retaliatory actions were taken by a final policy maker.

176.    Further, the retaliatory actions taken against Plaintiff were undertaken as part of a broader policy of CBSD and ratified by the Board.

## COUNT II

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. against Defendant Central Bucks School District**

177.    Plaintiff realleges and incorporates the facts and allegations contained in all prior paragraphs as fully set forth herein.

178.    Defendant CBSD retaliated against Burgess for engaging in statutorily protected activity, including but not limited to, advocating for LGBTQ+ students on multiple occasions and filing and getting involved in complaints of sex discrimination with OCR.

179.    Defendants' retaliatory acts include suspending Plaintiff from teaching, involuntarily transferring him to a different position, and additional acts referenced herein but not detailed at this time because of potential disclosure limitations.

180.    Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

181.    Retaliation for reporting discrimination based on sex is sex-based discrimination under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

182.     As a federal funding recipient, Defendant CBSD is subject to Title IX's prohibitions on sex- and gender-based discrimination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Andrew Burgess respectfully requests that the Court:

(a)     enter a declaratory judgment that Defendants' actions complained of herein are in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. and the First Amendment to the United States Constitution;

(b)     issue a permanent injunction restoring Plaintiff Burgess to the eighth-grade social studies position at Lenape Middle School; removing the "Discharge Warning" and any reference to his suspension from his personnel file; remediating other adverse actions taken against Burgess; and prohibiting further retaliatory actions against Burgess;

(c)     order all compensatory relief necessary to cure the adverse effects of Defendants' discriminatory actions on Plaintiff and/or nominal damages;

(d)     award Plaintiff punitive damages against Defendant Lucabaugh in his individual capacity;

(e)     award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(f)     order such other relief as this Court deems just and equitable.

                            Respectfully submitted,

April 11, 2023              **LeVAN STAPLETON SEGAL COCHRAN LLC**

                            By: */s/ Eli Segal*
                                Eli Segal (PA ID 205845)
                                John S. Stapleton (PA ID 200872)
                            1760 Market Street, Suite 403
                            Philadelphia, PA 19103
                            215.402.6555
                            esegal@levanstapleton.com
                            jstapleton@levanstapleton.com

                            **ACLU OF PENNSYLVANIA**

                            Witold Walczak (PA ID 62976)
                            Richard Ting (PA ID 200438)
                            P.O. Box 23058
                            Pittsburgh, PA 15222
                            412.681.7864
                            vwalczak@aclupa.org

rting@aclupa.org

**SETH KREIMER, ESQUIRE**
(PA ID 26102)
3501 Sansom Street
Philadelphia, PA 19104
215.898.7447
skreimer@upenn.edu

*Attorneys for Andrew Burgess*