**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ANDREW BURGESS,

                Plaintiff,

    v.

CENTRAL BUCKS SCHOOL DISTRICT, ABRAM
M. LUCABAUGH, in his official and individual
capacity,

                Defendants.

Civil Action No: 2:23-cv-1369-TJS
Jury Trial Demanded

**AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

JURISDICTION AND VENUE ..................................................................... 2

PARTIES ...................................................................................................... 2

FACTUAL ALLEGATIONS .......................................................................... 3

    A.    Andrew Burgess's Career with the District ..................................... 3

    B.    Burgess's Work With LGBTQ+ Students ....................................... 4

    C.    At the Request of Student 1 and His Family, Burgess Files a Complaint with OCR about the Persistent, Unresolved Bullying that Student 1 Continued to Experience ........................................................................................... 6

    D.    Burgess's Advocacy Related to CBSD's Classroom Library Policies ................. 9

    E.    CBSD Administration Criticize Burgess for His Advocacy ............................... 10

    F.    Burgess Questioned Again about New Issue Related to CBSD Policies Impacting LGBTQ+ Students ............................................................... 11

    G.    CBSD Suspends Burgess ................................................................. 12

    H.    After Burgess's Suspension, Defendants Take No Discernible Action to Address the Bullying that Student 1 Was Experiencing ................................... 18

    I.    CBSD Involuntarily Transfers Burgess ........................................... 19

    J.    Additional Retaliatory Act by Defendants ....................................... 20

    K.    CBSD Learns about Burgess's Involvement in Two New OCR Complaints Against the District ..................................................................... 21

    L.    Defendants Single Out Burgess for Scrutiny After Learning about the New OCR Complaints ............................................................................... 22

        i.    CBSD Confiscates Burgess's Laptop ............................................ 22

        ii.    Defendants Force Burgess to Sit for an Interview and His Is the Only Employee Interview that Includes a Court Reporter and Is Under Oath ....... 23

        iii.    The District's Lawyers Surprise Burgess by Bringing a Court Reporter, Putting him Under Oath, and Aggressively Questioning Him ...................... 24

    M.    CBSD Holds a Public Presentation by a District Lawyer and Releases a 151-Page Report Excoriating Burgess ................................................................. 26

        i.    Burgess is Falsely Accused of "Manipulating" Student 1 and Concealing Student 1's Bullying ...................................................................... 28

        ii.    The CBSD Report Claims Burgess Violated a Non-existent District Policy 28

        iii.    The Report Falsely Claims the District Did Not Know about Burgess's OCR Complaint ........................................................................................ 29

iv.   The CBSD Report Falsely Suggests Burgess Submitted the OCR Complaint without Student 1's Mother's Consent ........................................ 30

v.    The CBSD Report Falsely Alleges Burgess Covered Up Abuse ................. 31

vi.   The CBSD Falsely Claims Burgess "Manipulated" a Second Student ......... 31

vii.  Other False and Misleading Elements in the Report .................................... 32

N.    CBSD Suspends Burgess Again ...................................................... 33

O.    CBSD Is Responsible for the Retaliation Burgess Suffered,  and Punitive Damages Are Warranted Against Lucabaugh ........................................ 34

CAUSES OF ACTION ............................................................................ 35

PRAYER FOR RELIEF ............................................................................ 39

## INTRODUCTION

Teacher Andrew Burgess advocated for the safety, welfare, and inclusion of LGBTQ+ students, including by reporting discrimination to the U.S. Department of Education, Office for Civil Rights ("OCR"). For that, Central Bucks School District ("CBSD" or the "District") retaliated against him by suspending him and then involuntarily transferring him from the school where he had taught for fourteen years. The retaliation continued and worsened when Burgess engaged in additional protected activity by reporting the District's retaliation against him to the OCR, providing information to support an OCR complaint filed by seven Central Bucks families alleging systemic LGBTQ+ discrimination and a hostile educational environment, and filing this lawsuit.

In a highly visible and public campaign, the District attacked Burgess's character, made false representations about him, blamed him for the negative public attention the District had received for its hostile actions towards LGBTQ+ people, and then suspended him *again* based on the same conduct for which it had previously disciplined him. In a results-oriented, kaleidoscopic presentation of self-described "facts" and "evidence," the District told the public a false story that Burgess "manipulated" a student into filing an OCR complaint to promote a narrative that CBSD maintained a hostile education environment for LGBTQ+ students. But the lawyers conducting the District's investigation never spoke to the student or family for whom Burgess filed the OCR complaint, failed to acknowledge that the student's mother signed a consent form for the OCR complaint, misleadingly suggested Burgess never got the mother's consent for the OCR complaint, and claimed Burgess violated a school reporting policy that was adopted only after the fact. And in their zeal to scapegoat Burgess, the District spoke to no LGBTQ+ students in addressing what was supposed to be an investigation into allegations that LGBTQ+ students faced a hostile

education environment in the District. Sadly, the District's false allegations not only harm Andrew Burgess, but also serve to gaslight the very real and tangible concerns of the District's LGBTQ+ students and allies.

Burgess remains suspended, and the retaliation continues. Burgess now brings claims under the First and Fourteenth Amendments to the United States Constitution, Article I of the Pennsylvania Constitution, and Title IX of the Education Amendments of 1972 ("Title IX"), seeking declaratory and injunctive relief and damages.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1343(a)(3) and (4). The Court has supplemental jurisdiction over the state constitutional claim pursuant to 28 U.S.C. § 1367(a).

2.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to this action occurred in the District, and the parties either reside or are subject to personal jurisdiction in the District.

## PARTIES

3.      Plaintiff Andrew Burgess is an adult resident of the Eastern District of Pennsylvania. He is an employee of Central Bucks School District.

4.      Defendant Central Bucks School District ("CBSD" or "the District") is a school district within the Commonwealth of Pennsylvania organized pursuant to the Public School Code of 1949, Act of March 10, 1949, P.L. 30, as amended, 24 P.S. §§ 1-101, *et seq*. The District's headquarters and principal place of business is located at 20 Welden Drive, Doylestown, PA 18901. CBSD has approximately 18,000 students and is the fourth largest school district in Pennsylvania. CBSD has 15 elementary schools (grades K-6), 5 middle schools (grades 7-9), and

3 high schools (grades 10-12). The District is a person acting under color of state law for the purposes of 42 U.S.C. § 1983. The District receives federal funds from the U.S. Department of Education and is subject to Title IX of the Education Amendments of 1972, which prohibits sex discrimination against any person in any education program or activity receiving federal financial assistance. The Board of School Directors of Central Bucks School District ("School Board" or "Board") is the governing body of CBSD.

5.      Defendant Dr. Abram M. Lucabaugh is the Superintendent of CBSD and is the highest-ranked employee at the District. He is sued in his official and individual capacity. As superintendent, Lucabaugh had authority from the District to recommend to the Board certain employment actions, including, but not limited to hiring, firing, and transfers. As superintendent, Lucabaugh also had authority to influence and directly undertake certain employment actions, including but not limited to suspending employees. Lucabaugh, who at all relevant times was acting under color of state law, had authority to take corrective action when confronted with allegations of discrimination.

## FACTUAL ALLEGATIONS

### A.      Andrew Burgess's Career with the District

6.      Burgess began his career at CBSD in 2006 as an eighth-grade teacher at Lenape Middle School.

7.      Prior to the 2021–2022 school year, CBSD had never formally disciplined Burgess.

8.      Burgess's goal as a teacher is to create a learning space that is emotionally and physically safe, while also providing academically challenging work that enables student growth. In keeping with that ethos, Burgess has long been an advocate for students.

B.    **Burgess's Work With LGBTQ+ Students**

9.      In recent years, Burgess has worked hard to help LGBTQ+ students, who regularly face bullying from other students.  Burgess has pressed CBSD administration on several occasions to provide better anti-discrimination training.

10.     For example, in 2016, Burgess applied, and was approved, for a grant by CB Cares, a local education foundation, to provide teacher trainings during the school day on diversity, equity, and inclusion ("DEI") issues.

11.     In 2018, Burgess began supervising Lenape's "No Place for Hate" program, a student-led, school-climate-improvement program developed by the Anti-Defamation League.

12.     As part of the program, Burgess and other faculty formed a committee that met with student leaders to discuss concerns about the climate at Lenape. The number one issue identified by students was the mistreatment of transgender students, who were suffering in part due to the District's failure to provide students and faculty with education and training on LGBTQ-related matters.

13.     In response, Burgess and the other members of the committee met with the Lenape administration and asked for programming to help transgender students. In the meeting, they discussed the discrimination occurring based on LGBTQ+ status, and the effect it was having on students. Principal Saullo and others in the administration rejected the request, indicating they would not conduct any programming on that issue.

14.     The situation for LGBTQ+ students has worsened since the election of new school board members in November 2021. A six-member majority of the new board and Superintendent Lucabaugh have adopted policies and taken actions on behalf of CBSD that negatively impact LGBTQ+ students.

15.     For example, CBSD has directed teachers to remove Pride flags, deeming them inappropriate "political symbols."

16.     CBSD has directed teachers not to use transgender students' preferred names and pronouns without parental consent.

17.     CBSD relegated a Human Growth and Development (health) class to at-home-video instruction after a non-binary child insisted on participating in the girls' class.

18.     CBSD implemented new library and textbook policies to eliminate so-called "sexualized content," an effort to censor LGBTQ+-themed materials.

19.     Since adoption of the new library book policy, CBSD has removed two LGBTQ+-themed books – *This Book is Gay*, by Juno Dawson and *Gender Queer*, by Maia Kobabe from school libraries. Many other books remain under review.

20.     In February 2022, the Board, Lucabaugh, Lenape Middle School Principal Geanine Saullo, and others in CBSD received an email from a former assistant principal advising that LGBTQ+ students were experiencing terrible bullying at CBSD schools, particularly Lenape.

21.     The email reported incidents of students barking at and pushing LGBTQ+ students in the hallway, throwing objects at them, threatening to beat them, and using the "f" slur.

22.     Despite this email to CBSD, such anti-LGBTQ+ behaviors continued at Lenape Middle School through the remainder of the school year.

23.     In or around March 2022, members of Lenape's Sexuality and Gender Alliance student club reported widespread anti-LGBTQ+ bullying, particularly during lunchtime, and identified three primary bullies. This information was shared with the Lenape administration, including Principal Saullo, but without identifying the students who had been bullied.

24.     CBSD again took no discernable action to address these reports of bullying. The administration told teachers that they could not do anything to address these bullying reports if the complaining students remained anonymous.

25.     But in fact, CBSD could begin to address these problems plaguing LGBTQ+ students even without identifying victims.  They could institute "best practices" recommended by the U.S. and Pennsylvania Education Departments, which many school districts have adopted specifically to address problems like those raised against CBSD.  Defendants have steadfastly refused parent and staff pleas to take such measures to counter gender-based discrimination and bullying.

**C.      At the Request of Student 1 and His Family, Burgess Files a Complaint with OCR about the Persistent, Unresolved Bullying that Student 1 Continued to Experience**

26.     Burgess first had Student 1 (a pseudonym used to protect a minor) in his classroom starting in the Fall of 2021. Student 1 is a transgender male.

27.     Burgess knew that Student 1 was having problems with other students bullying him based on his gender identity, and that the student and family had reported problems to the guidance department and administration.

28.     On one occasion in October 2021, Burgess personally walked Student 1 to a guidance counselor because Burgess found Student 1 crying after being repeatedly deadnamed by another student. Deadnaming is the act of referring to a transgender or non-binary person by a pronoun or name the person used prior to transitioning. Burgess also spoke with the student who had deadnamed Student 1, in the hopes of educating that student and preventing future bullying of Student 1.

29.     In February or March 2022, Burgess and a coworker attended a meeting of the Sexuality and Gender Alliance student club at Lenape to offer their support to students. Burgess

decided to attend the meeting after seeing the email sent by Lenape's former assistant principal, referred to in paragraphs 20-22, above.

30.     At the meeting, Burgess expressed his and other teachers' concern about the hostile environment for LGBTQ+ students described in the email. Because incidents often were not reported, Burgess explained how the District's BDR system[1] worked and showed students how to get teachers to report instances of bullying through that system.

31.     In early March, 2022, Student 1 approached Burgess to discuss the bullying Student 1 continued to experience based on his LGBTQ+ status and to ask for help. Student 1 came with his close-friend, "Student 2," who also had witnessed bullying issues.

32.     At Burgess's request, Student 1 sent Burgess an email describing various incidents he had experienced during the school year. Burgess had a practice of asking students who had complaints to chronicle the information in detail to ensure accurate reporting. The incidents Student 1 shared included other students deadnaming, hitting, and throwing things at Student 1.

33.     Burgess asked Student 1 whether he was thinking of hurting himself or otherwise in crisis, but Student 1 earnestly told Burgess that he was not.

34.     Burgess also determined that Student 1 was not describing child abuse, as defined by Pennsylvania law, and thus the situation did not trigger the mandated reporting procedures for teachers who suspect child abuse.

35.     Burgess worked with Student 1 to compile a Word document table listing the roughly twenty incidents Student 1 had experienced that school year. Burgess understood that

---

[1] BDR stands for Behavior Data Report. The BDR system was an optional reporting system that the District has since discontinued. Burgess participated in a committee at Lenape to help develop and implement the system to document and report student behavior incidents. Burgess was a prolific reporter in the BDR system, for which Lenape positively recognized Burgess as one of the school's top reporters.

Student 1 and/or family members had reported at least some of the incidents, which occurred earlier in the year, between September 2021 and January 2022.

36.    Burgess then met with Student 1, his mother and adult sister to discuss Student 1's problems with bullying during that year and possible steps to address the ongoing problems. Burgess advised them how they could file complaints with the administration, including the BDR process, and the possibility of filing a gender discrimination complaint with the U.S. Department of Education's Office for Civil Rights ("OCR").

37.    OCR's mission is to ensure equal access to education and to promote educational excellence through vigorous enforcement of civil rights. One of OCR's responsibilities is to receive and resolve complaints of discrimination, which can include severe and persistent bullying and harassment that constitutes a hostile educational environment.

38.    After taking time to think about the matter, in late March Student 1 asked Burgess to file an OCR complaint on his behalf.

39.    Burgess understood that Student 1 did not want to submit a report through the BDR system because it does not permit anonymous reports and would notify the offending students' parents. Student 1 was afraid of possible retaliation against him. It had already been made clear to Burgess and other teachers that the District was not taking action to address anonymously reported incidents of bullying.

40.    At no point did Burgess tell or encourage Student 1 or his family not to report Student 1's bullying to CBSD or Lenape administration.

41.    By March 31, 2022, Burgess had received the necessary paperwork from Student 1, including a form consenting to the complaint signed by Student 1's mother. On that day, Burgess completed the complaint document, and mailed it to OCR.

42.     In the complaint, Burgess alleged that CBSD committed discrimination "based on sex," specified "discrimination against a transgender student," and sought, as a remedy, "training for staff and students, particularly about equity and acceptance of LGBTQ+IA students and staff." Burgess also attached to the complaint the table of incidents that he and Student 1 jointly created.

### D.      **Burgess's Advocacy Related to CBSD's Classroom Library Policies**

43.     Meanwhile, at about the same time as Burgess was helping Student 1, another matter involving the District's handling of LGBTQ+ issues was coming to the fore.

44.     Before and during the 2021–2022 school year, some CBSD board members and administrators advocated removing purportedly inappropriate books from CBSD schools, with LGBTQ+-themed books as the apparent primary target.

45.     In the summer of 2021, community members publicly criticized a middle school teacher's LGBTQ+-themed classroom library after someone anonymously posted photos of the library online. District administration "audited" the teacher's classroom library to determine if it contained "inappropriate" material. Although CBSD did not identify any inappropriate material, the administration's response to the attacks had an intimidating effect on that teacher and on other teachers with classroom libraries, especially those who worked with students from minority groups.[2]

46.     Against this backdrop, Burgess, in his role as a union vice president, met with District administration twice during the 2021–22 school year to discuss the policies then under consideration and to relay teachers' concerns about them. Burgess advised the administration that teachers had told him they were confused by the policies and afraid that they could be disciplined for having any LGBTQ+-themed books in their classroom libraries.

---

[2] The Board would eventually pass new library and textbook policies focused on "sexualized content" in the summer of 2022, which has since been used to target LGBTQ+-themed books.

47.     On March 23, 2022, Saullo emailed teachers at Lenape asking them to see her individually if they had a classroom library.

48.     Saullo's email raised concerns for Burgess and other teachers that such individual meetings could lead to adverse disciplinary consequences for teachers and to the removal of books from the school.

49.     In his role as a union representative, Burgess sent an email reply to Saullo, requesting that the administration meet with the teachers as a group, rather than individually. Burgess reasoned that such a group meeting would help ensure that all teachers received the same information regarding any library censorship directives—a matter of substantial public concern. Saullo denied Burgess's group meeting request.

50.     Saullo clarified to Burgess that teachers were free to meet with her alone, with union representation, or not at all.

51.     Burgess faithfully relayed those three options to the Lenape teachers.

52.     During a faculty meeting a few days after local media reported on the climate of increasing fear among teachers regarding their classroom library collections, Saullo expressed her displeasure with the responses to the book policies, referenced the news story, and blamed the faculty for causing a panic about the issue.

**E.     CBSD Administration Criticize Burgess for His Advocacy**

53.     Soon thereafter, Burgess received an email from CBSD scheduling a meeting with him to address "concerns."

54.     The meeting occurred on Tuesday, April 19, 2022. Lucabaugh, Human Resources Director Andrea DiDio Hauber, Saullo, and CBEA (Central Bucks Educational Association, the teachers' union) President Bill Senavaitis attended.

55.     During the meeting Lucabaugh, DiDio Hauber, and Saullo criticized Burgess for his actions related to the classroom library issue.

56.     The meeting became increasingly hostile after Burgess disclosed that he had reported to OCR on behalf of a student.

57.     Burgess's disclosure made Lucabaugh visibly angry.

58.     The meeting lasted about ninety minutes.

59.     The meeting left Burgess panicked. And angry. He feared CBSD was targeting him for helping LGBTQ+ students and that CBSD might fire him.

60.     For the next few weeks, Burgess heard nothing more from the administration about any of the issues discussed at the April 19, 2022, meeting.

**F.     Burgess Questioned Again about New Issue Related to CBSD Policies Impacting LGBTQ+ Students**

61.     On May 3, 2022, Saullo sent an email advising staff that students who wanted to use a different name or pronoun—often the case with transgender students—would need to follow a formal process to get permission, beginning in the guidance office.

62.     The next morning, Burgess informed several students likely to be impacted by the new process. Some of the students went to the guidance office to inquire further.

63.     That same morning, Student 1's adult sister contacted the guidance office to complain about the new policy.

64.     Soon thereafter, the guidance office summoned Student 1 from class to ask him how he learned about the new policy. Student 1 identified Burgess as the information source.

65.     No one from the guidance department asked how Student 1 felt about the policy; they only wanted to know who told him about it.

66.     Shortly thereafter, Saullo and Lenape Assistant Principal Lauren Dowd spoke with Burgess during his lunch break to ask why he had told students about the policy.

67.     The next day, on May 5, 2022, Student 1's sister emailed Lenape administration criticizing the decision to pull her brother from class to ask how he found out about the policy as "*wildly* inappropriate." She also complained that she was "beyond frustrated with how the school is treating [Student 1] and making light of every single instance of bullying and harassment that has taken place during this school year" and stressed that Burgess was "the *only* faculty member to provide any assistance in dealing with this relentless bullying."

68.     That same day, May 5, Student 1 reached out to Burgess again and described two additional instances of bullying. Burgess asked for Student 1's consent to email Saullo and Dowd directly about those instances.   Student 1 agreed, and Burgess emailed the administrators that afternoon.

69.     The next morning, May 6, 2022, the Lenape main office summoned from Burgess's class one of the students who had bullied Student 1. When that student quickly returned to class, Burgess heard the student tell others something to the effect that the administration did not need him anymore because circumstances had changed. Soon thereafter, Burgess would learn how profoundly circumstances—notably his own circumstances—had changed.

**G.     <u>CBSD Suspends Burgess</u>**

70.     At about 11:30 a.m. on May 6, Saullo summoned Burgess to the Lenape main office conference room.

71.     Already present in the conference room when Burgess arrived were Lucabaugh, Saullo, DiDio Hauber, and Zach Marttila, a union representative.

72.     DiDio Hauber handed Burgess a letter, directed him to read it and declared that the administrators would not discuss it with him or answer any questions.

73.     Burgess read the letter, which stated as follows:

The purpose of this correspondence is to delineate issues that have been investigated with respect to your responsibilities concerning a student that has been bullied in your school. The investigation has included speaking to you as well as information provided from the parents of the child. What the investigation has revealed to date is that a child in your school has suffered multiple incidents of bullying by one or more students in your school. Not only were you aware of the situation, but you directed the child and the parents not to report the incidents to the principal, claiming that the administration would not do anything to alleviate the situation.

The investigation is continuing, but what has been revealed to date indicates a dereliction of your obligations to the child and parents of the child in your school, as well as a deliberate failure to follow the proper protocol so that the administration could address and rectify these bullying conditions. Indeed, your actions may have been responsible for the continuation of the bullying suffered by the student.

While this investigation continues, you are hereby suspended from all duties with the District. You may not enter District property without permission of the Superintendent or the Superintendent's designee. The suspension, at this time, is with pay. At the conclusion of the investigation, you will be advised what discipline will be meted out to you, which discipline may include suspension and/or termination of your employment.

If you have any questions regarding the terms of your current suspension, please contact Andrea DiDio Hauber, Director of Human Resources. If at some point you need to obtain personal materials from your classroom, please contact Ms. DiDio Hauber and she will make arrangements with the Principal to have you receive such personal items.

In addition to the above situation, it has also been brought to the attention of the Principal that you directed teachers in your building not to speak to the Principal who needed to confer with teachers with respect to issues of appropriate reading materials being made available to students. The purpose of the conversation was to inform the teachers as to the District policy with respect to such materials and was not in any way a disciplinary hearing. It has been reported that you advised teachers not to have such conversations with the Principal and "not to cross Union lines", whatever that may mean.

Your actions in trying to direct teachers to engage in concerted activity would have been a violation of their obligations, not only under the collective bargaining agreement, but also under law. The focal point is that you tried to direct them into this improper activity. Again, this is part of the current investigation, and you will be advised as to what consequences will flow from your improper actions.

13

Please let me know if you have further questions at adidio@cbsd.org.

Sincerely, Andrea L. DiDio Hauber, Director of Human Resources

74.     Thus, the letter set out two reasons for the suspension: that Burgess purportedly did

not report the bullying that Student 1 had experienced, and that he allegedly told teachers not to

speak to the principal about their classroom libraries.

75.     The letter contains multiple inaccuracies, including but not limited to the following:

    a.      Burgess did not "fail[] to follow the proper protocol." At the time, the
District had no policy or protocol *requiring* teachers to report bullying or harassment to the
administration. It was optional. Indeed, the District did not identify any specific policy or protocol
in the suspension letter because they did not have such a policy *at the time*; the Board passed a
new policy in *June 2022,* but that was one month *after* CBSD suspended Burgess.

    b.      Burgess *did* report the bullying of Student 1—he did so to OCR.

    c.      Burgess did *not* direct Student 1 or his family not to tell the administration
about the bullying. Burgess informed them of options, both within CBSD and externally to OCR,
and respected their decision. They decided not to file with the school but rather to file a complaint
with OCR.

    d.      Instead of causing Student 1 harm, Burgess was – as Student 1's sister noted
in her May 5 email to the District – Student 1's sole safe haven after the administration did nothing
discernible throughout the year in response to Student 1's repeated complaints about bullying or
in response to the bullying of other LGBTQ+ students.

    e.      Burgess did *not* direct teachers not to speak to Principal Saullo about their
classroom libraries, but instead conveyed to them what he understood to be their options, based on
what Saullo had told him. Burgess never told teachers "not to cross Union lines."

76.     The letter's reasons for the suspension are pretextual. There was no legitimate

reason for suspending Burgess. CBSD was instead retaliating against Burgess for his involvement

in the OCR complaint and working with teachers on the classroom-library matter.

77.     DiDio Hauber, on behalf of CBSD, then ordered Burgess to have no contact with

any students or colleagues, and to turn over his District-assigned laptop and employee badge. She

advised him that the District was seizing everything in his room.

78.   Assistant Principal Dowd and union representative Marttila then escorted Burgess back to his classroom to collect his personal belongings.

79.   Because school was still in session, students and staff in the hallway saw Burgess being escorted back to his classroom.

80.   Cognizant of the directive that he not speak with anyone, Burgess awkwardly refused to respond to anyone who greeted him as he walked by.

81.   Burgess gathered the few items he was permitted to take from his classroom, leaving personal items, money, correspondence (including a copy of the OCR complaint and table of Student 1's incidents), class lessons, and sensitive union documents.

82.   Burgess was then escorted back into the hallway and out of the building.

83.   Students and teachers in classrooms with windows that looked out on the parking lot could see that Burgess was leaving in the middle of the school day.

84.   CBSD's decision to escort Burgess through the hallways and out of the building during the middle of the school day was unusual. Generally, CBSD treats only personnel who pose an imminent safety threat to students or others so harshly.

85.   The widespread attention to the incident led to unfounded and false rumors about Burgess, including that he had an inappropriate relationship with a student.

86.   Upon information and belief, the administration was aware of many teachers who failed to report bullying. Upon information and belief, no other teacher has been suspended or otherwise disciplined for a failure to report bullying to the administration. While Burgess was an active reporter of bullying through the BDR system and otherwise, many teachers in his school were not. Many bullying incidents were occurring and going unreported.

87.    On May 11, 2022, Burgess filed a second complaint with OCR, this time alleging that CBSD retaliated against him over the filing of the March OCR complaint for Student 1.

88.    Burgess's suspension created a backlash among members of the CBSD community, many of whom believed that CBSD suspended Burgess because of his advocacy for LGBTQ+ students.

89.    On May 10, 2022, a group of students did not report to their morning classes and assembled outside Lenape to demonstrate their support for Burgess.

90.    That night, the Board held its first meeting since Burgess's suspension.

91.    Lucabaugh made unscheduled comments acknowledging the pervasive bullying against LGBTQ+ students but offering no action to remedy it. He called on adults to "do better" but neither he, nor the Board, took any concrete actions or suggested any policy changes to improve the environment for LGBTQ+ students. Rather, Lucabaugh criticized "narratives" in the community critical of CBSD's policies regarding pride flags, changes to the Human Growth and Development class, and suspension of a teacher (i.e., Burgess).

92.    At the meeting, several students also spoke out against CBSD's suspension of Burgess, including one who said the following:

> At the beginning of the year, I came out as trans. I told all my teachers. I told them my name and my pronouns, and that they were only to refer to me as those. All of them were accepting of it. They didn't really care. However, the 8th grade student body seemed to have a different opinion on that. I've been constantly harassed. I've been bullied. I've had people yell in my face. I've had people call me a myriad of slurs. I've had things thrown at me, etcetera. One time, I had someone call me names that I would prefer not to repeat, and told me that they were going to assault me.
>
> Every time after this, I would go to guidance. I was always told that they were my safe space, that they were supposed to help me. That they wanted to help me. That they were the people that were supposed to make me feel safe. Every time I would go to guidance, I was always told things that were along the lines of 'they're just immature,' 'they'll grow out of it,' 'it's just MUD [i.e., made up drama].' Every

time I walked out of that counselor, I never felt safe. I never felt validated. I just felt . . . the exact same thing I felt when I was getting called slurs. I felt bullied. I didn't feel like I was cared for.

One time, I decided to go a different route. I told Mr. Burgess that a kid had deadnamed me, that he was misgendering me. And he was on top of it. He knew exactly what to do. He knew how to help me, and he knew how to support me. He asked me how I wanted to be supported, instead of throwing these things, saying that they're just immature, that they don't know what they're doing. He wanted me to feel safe.

After months and months of feeling invalidated, of feeling weird in my own skin, after feeling like I'm the problem, and that everyone else is the real person and that I'm just wrong, I finally felt ok. So I stopped going to guidance and I went to Mr. Burgess. Time and time again after getting called so many names, after getting so many threats, things thrown at me, being touched, I went to Mr. Burgess and he knew what to do. He knew how to help me. He asked me how I wanted to be helped. And I finally after the entire year of feeling like no one cared about me, had a safe space.

And then, on May 6, at 11:30-ish, Mr. Burgess got a letter saying that he was suspended. And at that exact same time, I lost one of the only people that has ever really cared for me. That really wanted to stay by my side and help me. That actually wanted to get things done instead of letting things slide. I lost the only person that really cared about me as a person.

93.    In subsequent days, students and community members continued to protest CBSD's treatment of Burgess, including by demonstrating outside of Lenape during school hours, honking car horns and waving signs, and organizing a day of silence.

94.    Burgess neither promoted nor participated in the protests.

95.    Lucabaugh, in conjunction with Board President Dana Hunter, issued a statement to the entire school community, including parents, calling the protests occurring at Lenape an "abomination," and describing the "narrative" about Burgess's suspension as "inflammatory." While he wrote that he could not comment on employment matters, Lucabaugh stated that staff "must adhere to a process for reporting potentially harmful events and situations," insinuating that CBSD had suspended Burgess for failing to protect students.

**H.**     **After Burgess's Suspension, Defendants Take No Discernible Action to Address the Bullying that Student 1 Was Experiencing**

96.     Despite Defendants' claim that Burgess's failure to report Student 1's bullying prevented Defendants from "address[ing] and rectify[ing] these bullying conditions," and "may have been responsible for the continuation of the bullying suffered by the student," Defendants and other District administrators failed to effectively address Student 1's difficulties.

97.     Indeed, Student 1's situation became even worse after Burgess's suspension.

98.     The cafeteria has long been a place where student-on-student bullying and harassment of vulnerable students is at its zenith.

99.     Over the past several years, CBSD has refused repeated entreaties by counselors and teachers, including Burgess, to provide training to help support LGBTQ+ students—training that would have included the aides who typically monitor the cafeteria. Incidents of bullying are a daily occurrence in eating spaces, making Student 1—and many other LGBTQ+ students—feel unsafe.

100.     After Defendants suspended Burgess in early May 2022, Student 1 (and other transgender students at Lenape) stopped going to eat in the cafeteria for the remainder of the school year. The cafeteria was where Student 1 felt least safe from bullying, and after Burgess's suspension, the hostility towards him and other transgender students worsened.

101.     For the remainder of the school year, Student 1 spent lunchtime at the guidance office—not to meet with a guidance counselor, but to escape from bullying in the cafeteria.

102.     Neither Saullo nor guidance staff who saw Student 1 eating lunch in the guidance office ever asked why he was eating there and not in the cafeteria.

I.      **CBSD Involuntarily Transfers Burgess**

103.    Burgess heard nothing from CBSD for over three months after his suspension, leaving him anxious about whether he would have a job when school resumed. As a precaution, Burgess studied to become certified to teach sixth grade in case he had to seek a new job.

104.    In late July, CBSD contacted the CBEA to request that Burgess sign a "Discharge Warning."

105.    Burgess disagreed with all of the charges in the "Discharge Warning" and, through the union, requested changes to the language. He also asked that he be able to return to Lenape as a condition for signing the "Discharge Warning."

106.    On August 18, 2022—seven days before the start of the new school year—Burgess was summoned to meet with Lucabaugh.

107.    When Burgess arrived, he was given a revised "Discharge Warning," which contained the same language as the initial version he had received, but added a statement that "Burgess contests these charges."

108.    Burgess signed the document. He did so with the understanding that it ended his suspension and resolved the District's investigation of him for the events of the prior months.

109.    Also at the meeting, Lucabaugh told Burgess that CBSD was transferring him to Unami Middle School and assigning him to teach seventh grade social studies—even though he had taught eighth grade social studies at Lenape for the past fourteen years.

110.    Burgess told Lucabaugh he did not want to switch schools.

111.    Upon information and belief, since Burgess started in 2006, CBSD has not transferred any other teacher for a purported failure to report bullying.

112.    The School Board approved Burgess's transfer at its September 13, 2022, Board meeting, with an effective date of August 23, 2022.

113.    The involuntary transfer—one week before the start of school and to a different grade with unfamiliar content—forced Burgess to spend significant time learning a new curriculum and preparing new lesson plans.

114.    Moreover, once the new school year began, Burgess realized that CBSD increased his workload by assigning him more students than ever before, and more than any other seventh grade social studies teacher at Unami. Burgess estimates that the new position and larger class sizes generated an additional four hours of work per week.

115.    All in all, the switch from a familiar environment where he had developed relationships and mastered his assigned subject matter over the course of fourteen years to a new school and a new grade level and larger classes made Burgess's job more difficult.

116.    Defendants did not transfer Burgess for any legitimate educational reason. Rather, the change in terms and conditions of his employment constituted retaliation against Burgess over his advocacy on behalf of students and teachers, including his involvement with Student 1's OCR complaint.

### J.    Additional Retaliatory Act by Defendants

117.    Shortly after Defendants transferred Burgess to Unami Middle School in late August, Burgess learned about another substantial retaliatory act that he believes was ordered, directed, or authorized by Defendants over the summer. That action threatens Burgess's ability to continue working in his chosen profession.

118.    Due to legal constraints on disclosure, Burgess does not detail that act here.  The District is aware of the act, and Burgess will be following the statutory procedure for seeking permission to disclose it to the Court.

119.     Contemporaneous with this Amended Complaint, Burgess is filing a document under seal to share only with the court and Defendants additional information about the retaliatory act.

120.     Defendants' retaliatory action against Burgess violates his rights under the First and Fourteenth Amendments, Title IX and the Pennsylvania Constitution.

### K. CBSD Learns about Burgess's Involvement in Two New OCR Complaints Against the District

121.     On September 21, 2022, OCR notified CBSD via an e-mailed letter that Burgess had filed a complaint alleging that "the District suspended him from teaching on May 6, 2022 in retaliation for providing the parent of a District LGBTQ+ student with information about OCR and his filing an OCR complaint alleging sex-based discrimination by the District," and that OCR was opening the complaint for investigation.

122.     OCR's letter requested information and documents from CBSD, and stated:

> Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, or participates in an OCR proceeding. If this happens, the individual may file a retaliation complaint with OCR.

123.     On October 6, 2022, seven transgender and non-binary students, including Student 1, through their parents and represented by the ACLU, filed a gender-based-discrimination complaint with OCR and the U.S. Department of Justice against CBSD.

124.     The seven students' OCR complaint references Burgess's two OCR complaints, his suspension, and information describing his communications with CBSD.

125.     It would have been obvious to the Defendants from publicly available portions of the OCR complaint that Burgess had cooperated with the seven students' lawyers in the preparation of the students' complaint.

21

**L.**     **Defendants Single Out Burgess for Scrutiny After Learning about the New OCR Complaints**

126.     On November 15, the Board voted 6-3 to hire a Philadelphia law firm "to represent Central Bucks School District ('CBSD') in connection with the administrative complaint filed against CBSD with the US. Department of Justice ('DOJ') and the U.S. Department of Education ('ED') by the American Civil Liberties Union of Pennsylvania relating to alleged violations of Title IX of the Educational Amendments Act of 1972 ('ACLU complaint')" and "two similar complaints filed against CBSD with ED before the ACLU complaint."

127.     None of the complaints allege misconduct by Burgess or suggest in any manner that he should be a target of an investigation.

*i.  CBSD Confiscates Burgess's Laptop*

128.     On December 6, Unami principal Brian Loving came into Burgess's classroom near the end of the workday and told him that the "district office" had directed Loving to seize Burgess's District-issued laptop.

129.     When Burgess began to close the files he was working on for the next day's lessons, Loving said he had been directed not to let Burgess touch anything on the computer. Burgess handed over his computer and Loving gave him another laptop.

130.     The next day, Lucabaugh responded to the CBEA President's inquiry about the laptop seizure by saying, "we hired a firm to investigate the OCR complaint and part of that investigation involves searching a few devices in the district, and his (Burgess's) was one of them."

131.     Upon information and belief, the District did not seize any other CBSD employees' computers as part of the OCR complaint investigation.

ii. *Defendants Force Burgess to Sit for an Interview and His Is the Only Employee Interview that Includes a Court Reporter and Is Under Oath*

132.     On December 19, 2022, Burgess received via email a letter from one of the lawyers hired in November by the District. The letter advised Burgess that the lawyer "represent[ed] the Central Bucks School District with respect to certain complaints filed with the U.S. Department of Education's Office for Civil Rights," and was "retained to conduct an investigation of the allegations" of "discrimination, harassment, and bullying" raised in those complaints. The lawyer indicated that "[a]s part of the investigation process, I would like to interview you," and invited Burgess to "please let me know, by no later than December 27, 2022, whether you will agree to meet with me."

133.     No complaints filed with OCR allege misconduct by Burgess, and nothing in the December 19, 2022, letter indicated that the District was investigating Burgess for alleged misconduct.

134.     At least four other teachers, all still at Lenape, received similar emailed letters at about this time requesting a meeting.

135.     All or most of the teachers, including Burgess, elected not to respond to the interview request.

136.     On January 3, 2023, the lawyer sent a second letter to Burgess via email reiterating that he "represent[ed] the Central Bucks School District with respect to certain complaints filed with the U.S. Department of Education's Office for Civil Rights," noting Burgess's failure to respond to the first letter, and indicating that the lawyer had scheduled Burgess for an interview at noon on Thursday, January 12 at Unami Middle School, and that "arrangements have been made for coverage of your classes for the afternoon of January 12."

137.     On January 6, a lawyer for the teachers' union wrote back to the District's lawyer that all five teachers, including Burgess, were declining the invitations for an interview.

138.     That same day, the District's lawyer responded in a letter to the union's lawyer stating that the teachers' "participation is not optional, at least not without potentially adverse employment consequences."

139.     In an exchange of emails on January 6 and 7, the District's lawyer advised the union's lawyer that Burgess's interview was being moved up to 10:30, instead of noon, on January 12. The union's lawyer advised the District's lawyer that the teachers may bring a "union rep[resentative]." The union representative is not a lawyer.

140.     At no time did the District's lawyer inform Burgess that he was being investigated for misconduct or that he had a right to have counsel present for the interview.

        *iii.   The District's Lawyers Surprise Burgess by Bringing a Court Reporter, Putting him Under Oath, and Aggressively Questioning Him*

141.     Burgess was the last to arrive at his interview in an Unami Middle School meeting room on Thursday, January 12. Sitting at the head of a table was a court reporter. Next to the one open chair beside the court reporter sat the non-lawyer union representative. On the other side of the table sat three lawyers for the District, including the two leading the investigation.

142.     Burgess had no notice that his "interview" would be under oath and transcribed by a court reporter.

143.     In none of the letters or emails from the District to Burgess (or the other teachers) and the union's lawyer did the District's lawyers indicate the interview would be with a court reporter.

144.     Burgess had a union representative present at the interview but did not have legal representation.

145.    Almost immediately upon arriving in the room, the interview began with Burgess being put under oath.

146.    Burgess started the interview by stating:

> I'd like to start just by letting you know, in case you do not know, that I do have an active claim with the OCR for retaliation, and the letter I received from the Office of Civil Rights and the Department of Education does indicate that the District must not harass, coerce, intimidate, discriminate or otherwise retaliate against any individual, because that individual asserts a right or privilege enforced by OCR or filed a complaint.

147.    One of the District's lawyers then warned Burgess that there could be employment consequences if he refused to participate in the interview, and employment or even *criminal* consequences depending on what Burgess said.

148.    After the lawyer informed Burgess of potential employment and criminal consequences whether or not Burgess participated in the interview, the lawyer asked Burgess, "Do you have counsel in this matter, actual attorney that's representing you in this matter?" The lawyer did not define "this matter."  Believing the interview was about the alleged hostile environment claims made by LGBTQ+ students and Burgess's two OCR complaints (one on behalf of Student 1 and his own alleging retaliation), Burgess did not understand "this matter" to be an investigation of Burgess's own conduct.

149.    Once the interview began, most of the questioning pertained to Burgess's own conduct, especially as it related to his filing of the OCR complaint for Student 1. The questioning also touched on Burgess's cooperation with the ACLU, which in addition to representing Burgess in this matter also represents the seven families in the October 2022 OCR complaint.

150.    At numerous points in the four-plus hour interrogation, the lawyers questioning Burgess tried to steer Burgess's testimony to a pre-ordained narrative. On multiple occasions, they

would not accept the answers Burgess gave to questions and repeated them several times in an effort to get answers that fit their desired version of events. Without counsel, Burgess struggled to tell his side of the story, and left the interview feeling brutalized.

151.    At no time during this process did the District's lawyers inform Burgess that they were investigating potential misconduct by Burgess. To the contrary, the two letters stated that the lawyers "represent[ed] the Central Bucks School District with respect to certain complaints filed with the U.S. Department of Education's Office for Civil Rights." Those complaints pertained to the District's alleged failures to provide a safe and supportive environment for students from a protected minority group.

152.    Upon information and belief, the District's lawyers did not seize computers from or subject any of the other approximately eight teachers or staff they interviewed for the Board-directed investigation to a transcribed interview under oath.

## M.    CBSD Holds a Public Presentation by a District Lawyer and Releases a 151-Page Report Excoriating Burgess

153.    Burgess filed this lawsuit on April 11, 2023.

154.    Just nine days later, on April 20, 2023, the Board held a special meeting "to receive the report from special counsel who has conducted the investigation into the allegations contained in the complaint against the school district by the ACLU [on behalf of seven students] with the United States Department of Education," and to "consider the dissemination of the report."

155.    The Board voted 6-to-3 to disseminate the contents of the report and investigation to the public.

156.    Immediately following the Board vote, one of the District's lawyers made an approximately two-hour public presentation, complete with PowerPoint slides, to a packed room

of people from the community and press. The District also live streamed the presentation on the internet.

157.    The District's lawyer stated that the investigation was focused on four complaints filed with OCR against the District, including the complaint Burgess filed alleging the District retaliated against him for providing a parent with information about OCR, and the complaint filed on behalf of seven students alleging a hostile environment for LGBTQ+ students.

158.    Even though none of those complaints alleged misconduct by Burgess, the District's lawyer focused largely on Burgess's handling of Student 1's complaints, culminating in the OCR filing. Relying on factually unsupported inferences and assumptions, and outright falsehoods, the lawyer accused Burgess of "manipulating" Student 1 and, effectively, helping to contrive a public narrative that the district failed to help LGBTQ+ students.  The attorney closed by recommending that the District suspend Burgess without pay.

159.    After the special board meeting, the District published on its website a 151-page report titled, "Internal Investigation Report as Requested by the Central Bucks School District" ("CBSD Report"), with 105 attachments and the slides from the District lawyer's presentation. The District also published a video recording of the special board meeting, including the District lawyer's presentation, on its vimeo webpage.[3] The District continues to publish all of this content online.

160.    The day after the special board meeting, the District alerted all CBSD community members via email about the District lawyers' public presentation and CBSD Report, and included links to the Report and a video recording of the special board meeting and public presentation.

---

[3] Vimeo is an online video hosting service. CBSD's vimeo page includes board meeting recordings and various other videos.

161.    As with the Board presentation, the CBSD Report purports to address the four OCR complaints identified in the District's lawyer's presentation. Even though none of those complaints alleged misconduct by Burgess, the CBSD Report largely focused on and demonized Burgess and recommended he be suspended without pay.

162.    The presentation and report excoriated and made false allegations about Burgess, including but not limited to the following:

> i.  *Burgess is Falsely Accused of "Manipulating" Student 1 and Concealing Student 1's Bullying*

163.    Much of the presentation and CBSD Report focused on Burgess's efforts to help Student 1 address bullying.

164.    The CBSD Report alleged that Burgess "manipulated" Student 1 to not report instances of bullying to guidance counselors or administrators.

165.    But the lawyers who conducted the investigation and prepared the CBSD Report never spoke with Student 1 or Student 1's family.

166.    If the lawyers had spoken to Student 1 and his family, they would have confirmed Burgess's interview testimony that Burgess initially encouraged Student 1 to report each instance of bullying to the District, but that Student 1 did not want Burgess to report the information to the District due to fear of retaliation from other students.

167.    The decision to file a complaint with OCR, rather than with the District, was made by Student 1 and family members.  Indeed, Student 1's mother signed a consent form for the OCR complaint—a fact absent from the District's public lambasting of Burgess.

> ii.  *The CBSD Report Claims Burgess Violated a Non-existent District Policy*

168.    The CBSD Report concluded that, prior to CBSD suspending Burgess, he violated the provision of CBSD Board Policy 104 that states: "[a] school employee who suspects or is

28

notified that a student has been subject to conduct that constitutes a violation of this policy shall immediately report the incident to the building principal." This language requiring reporting to the building principal was added to CBSD Board Policy 104 in June 2022, one month *after* CBSD suspended Burgess. This version of Board Policy 104, therefore, could not have justified CBSD suspending Burgess on May 6, 2022.

                *iii.*   *The Report Falsely Claims the District Did Not Know about Burgess's OCR Complaint*

169.     The CBSD Report also falsely states that, "until this independent investigation, the School District was not even aware that Mr. Burgess had filed the OCR complaint relating to Student 1" and that the list of incidents "was only discovered through [the District's lawyers'] investigation." These false assertions were made to support the CBSD Report's conclusion that the District did not retaliate against Burgess for filing an OCR complaint.

170.     The District's own documents indicate these assertions are false. Attached as Exhibit 57 to the CBSD Report is a document described as Saullo's notes of the April 19, 2022, meeting. According to those notes, Burgess informed CBSD administration about a list of incidents shared by a student, and that the list was used to help the student fill out an "OCR form."

171.     When the District suspended Burgess on May 6, 2022, and seized the contents of his office, a copy of the OCR complaint and table of bullying incidents was in his desk.

172.     Moreover, a September 21, 2022, letter from OCR notifying the District about the second OCR complaint Burgess filed states: "The Complainant, Andrew Burgess, alleges the District suspended him from teaching on May 6, 2022 in retaliation for providing the parent of a District LGBTQ+ student with information about OCR and his filing an OCR complaint alleging sex-based discrimination by the District."

173.    Additionally, the publicly-available redacted version of the OCR complaint filed in October 2022 on behalf of seven students states that a teacher "filed an OCR complaint in late March 2022, regarding the anti-transgender bullying experienced by [redacted] at Lenape Middle School." District administration would have known the referenced teacher was Burgess and that the student was Student 1.

iv.  *The CBSD Report Falsely Suggests Burgess Submitted the OCR Complaint without Student 1's Mother's Consent*

174.    The CBSD Report also misleadingly suggests that Burgess improperly signed a form on behalf of Student 1's mother without her permission. Specifically, the CBSD Report states that "the evidence suggests that after Mr. Burgess received an e-mail from OCR on April 14, 2022 [Ex. 15] stating that a signature was required on the Consent Form—and having failed to convince Student 1's mother to go along—Mr. Burgess just went ahead and signed the form himself [Ex. 56]."

175.    The April 14, 2022, email from OCR is addressed to Burgess, and states, "[o]ur procedures require *your* signature on a '**Consent Form for Use of Personal Information**' form in cases where we must disclose your identity. Please sign and date the enclosed form and return it to us . . . ." (first emphasis added). The email clearly asks *Burgess*, not Student 1's mother, to sign and return the form.

176.    OCR did not request a consent form from Student 1's mother because Student 1's mother had already signed the required consent form, which Burgess submitted with the complaint.

177.    The required consent form has two options – option "A" giving "OCR consent to reveal my identity (and that of my minor child/ward on whose behalf the complaint is filed) to others to further OCR's investigation and enforcement activities," and option "B" <u>not</u> giving such consent. Consistent with Student 1 and Student 1's mother's wish to not have their identities

revealed to the District, Student 1's mother signed option "B," approving the filing of the complaint, but not giving OCR consent to disclose her or her child's identity to the District.

178.     On September 21, 2022, OCR informed Burgess it was dismissing the complaint filed on behalf of Student 1 because "disclosure of the identity of an alleged injured party . . . is necessary in this case as your complaint alleges discrimination that is individual in nature," and a parent of Student 1 had not provided consent to disclose Student 1's identity.

179.     OCR, therefore, dismissed the complaint not for lack of merit, but because the complaint alleged discrimination that is individual in nature and Student 1's mother did not consent to OCR disclosing her or Student 1's identity to CBSD or others.

*v.   The CBSD Report Falsely Alleges Burgess Covered Up Abuse*

180.     The CBSD Report also falsely states that Burgess "covered up" alleged "abuse" of Student 1. Burgess could not have "covered up" alleged "abuse" because there were no allegations that Student 1 was the victim of child abuse, as defined by Pennsylvania law. If CBSD's allegation were true, CBSD administrators themselves would have been obligated to report the suspected abuse of Student 1 to the Pennsylvania Department of Human Services. Upon information and belief, nobody from CBSD has reported any suspected child abuse of Student 1 to the Pennsylvania Department of Human Services.

*vi.   The CBSD Falsely Claims Burgess "Manipulated" a Second Student*

181.     The CBSD Report also falsely alleges that Burgess "manipulated" a second student, identified as "Student 2" in the CBSD Report. There is no factual basis for this conclusion.

182.     Upon information and belief, the District's lawyers who conducted the investigation that resulted in the CBSD Report never spoke with Student 2 or Student 2's family.

183.     If District lawyers had spoken with Students 1 and 2, they would have learned that the two were close friends. As Burgess explained to the District's lawyers when they interviewed

him, Student 1 and Student 2 asked to speak with Burgess together during lunch about instances of bullying.

*vii.   Other False and Misleading Elements in the Report*

184.    The CBSD Report also states that Burgess "violated state law," but does not identify any law he allegedly violated.

185.    The CBSD Report criticizes Burgess for alleged failure to report to administration bullying concerns raised by three parents. The CBSD Report fails to acknowledge that, as Burgess explained in his interview, he did not report those concerns to administration because the parents *had already reported* their concerns to administration.

186.    Consistent with the District's harsh treatment of Burgess for reporting to OCR, the CBSD Report frequently refers to OCR with antipathy, repeatedly criticizing the office and its employees.

187.    The CBSD Report also reveals the District's hostility to the concerns of LGBTQ+ students, dismissing their complaints of bullying as the result of a "sense of victimhood."

188.    The CBSD Report concluded by alleging that "Mr. Burgess has demonstrated that he currently should not be entrusted with the care or education of children."

189.    The presentation and CBSD Report garnered substantial media attention, much of which focused on the District's false allegations against Burgess.

190.    Prior to the special board meeting and publication of the CBSD Report, the District never notified Burgess that the District was investigating him for potential misconduct, such as violations of school district policies or state law.

191.    Prior to the special board meeting and publication of the CBSD Report, the District never notified Burgess that the District planned to publicize allegations detrimental to Burgess's reputation, including allegations that he "manipulated" students, that he had an "ulterior motive"

in filing OCR complaints, that he "violated state law and School District policy," and that he "has demonstrated that he currently should not be entrusted with the care or education of children."

### N.    **CBSD Suspends Burgess Again**

192.    On April 21, 2023, the day after the special board meeting, CBSD once again suspended Burgess with pay.

193.    A letter from CBSD to Burgess stated:

> Allegations have been made that require further investigation and that, if true, may constitute neglect of duty, persistent negligence in the performance of duties, persistent and willful violation of school law, and improper conduct. While we are investigating these matters further, effective at the close of business on Friday, April 21, 2023, you are being placed on administrative leave with pay from your position.

194.    Prior to Burgess's suspension, Burgess did not receive any notice or opportunity to respond.

195.    The letter further directed him and his counsel to "keep everything (including, but not limited to the allegations, and all details thereof, the facts relating to this matter, the people involved, this process, the results of this process, witness names) fully confidential." (Parenthetical in original).

196.    This language acted as a "gag order," preventing Burgess and his attorneys from responding to the spurious allegations against him in the days following the special board meeting, on pain of discipline, including discharge.

197.    Defendants did not release Burgess from this gag order until after he filed for a temporary restraining order and preliminary injunction, in this action, against the District.

198.    To this day, Burgess remains suspended indefinitely.

**O.**     **CBSD Is Responsible for the Retaliation Burgess Suffered, and Punitive Damages Are Warranted Against Lucabaugh**

199.     Lucabaugh was aware of Burgess's advocacy on behalf of LGBTQ+ students and his involvement in OCR complaints.

200.     Upon information and belief, as a policymaker for CBSD, Lucabaugh ordered, directed, authorized, and/or affirmatively caused both of Burgess's suspensions. Lucabaugh possessed the final authority to suspend Burgess.

201.     Upon information and belief, if Lucabaugh needed authority from the Board to suspend Burgess, the Board approved the decisions.

202.     Upon information and belief, Lucabaugh ordered, directed, authorized, and/or affirmatively caused Burgess's transfer from Lenape to Unami, where Burgess was required to teach a new grade level, with new subject matter and more students.

203.     At all times relevant to this Complaint, Lucabaugh was acting within the scope of his employment with CBSD.

204.     Based on all the circumstances alleged herein, Lucabaugh acted with malicious intent and/or was recklessly or callously indifferent to Burgess's federally protected rights.

205.     Upon information and belief, the Board was aware of Burgess's advocacy on behalf of LGBTQ+ students and his involvement in OCR complaints.

206.     The Board, which is a policymaker for CBSD, ratified Burgess's transfer at its September 13, 2022, Board Meeting.

207.     The Board voted to hire the law firm to conduct the investigation of the OCR complaint filed on behalf of seven students and the "two similar complaints" filed against CBSD. The Board is responsible for directing the law firm's investigation into those complaints. That investigation has included additional actionable retaliatory acts against Burgess.

208.     The Board voted to release the CBSD Report publicly, and to have the District's lawyer present the CBSD Report at a live-streamed special board meeting attended by a roomful of community members and media representatives. The Board is responsible for the publication of information in the District's lawyers' presentation and the CBSD Report.

209.     The day following the special board meeting, the District suspended Burgess for a second time. Upon information and belief, as a policymaker for CBSD, the Board ordered, directed, authorized, and/or affirmatively caused Burgess's suspension on April 21, 2023.

210.     To the extent other employees of CBSD were involved in the actions taken against Burgess, such as Principal Saullo, such involvement was in the scope of their employment with CBSD and, where applicable, as a policy maker for CBSD.

211.     Moreover, Lucabaugh and CBSD's actions described herein were taken as part of a broader policy of CBSD and ratified by the Board.

## CAUSES OF ACTION

### COUNT I

**Violation of 42 U.S.C. § 1983**
**Based on Deprivation of Plaintiff's Rights under the First Amendment to the United States Constitution against All Defendants**

212.     Plaintiff re-alleges and incorporates the facts and allegations contained in all prior paragraphs as if fully set forth herein.

213.     As described above, Plaintiff engaged in activity protected by the First Amendment, including, but not limited to, advocating for LGBTQ+ students on multiple occasions, filing or otherwise being involved in OCR complaints, filing this federal lawsuit, and generally speaking out on issues of public importance.

214.     Defendants retaliated, and are continuing to retaliate, against Plaintiff for his protected activity in violation of his rights under the First Amendment to the U.S. Constitution, made applicable to CBSD by the Fourteenth Amendment. This retaliation has subjected and continues to subject Burgess to deprivation of rights under the Constitution of the United States, entitling Burgess to redress from Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. This retaliation serves no legitimate purpose and is intended to punish Plaintiff for his protected speech and to deter plaintiff and other teachers from speaking out or petitioning in ways that challenge the Defendants.

215.     Defendants' retaliatory acts include suspending Plaintiff from teaching, twice; placing him under investigation, twice; involuntarily transferring him to a different position; subjecting him to a four-hour interview without notice of the actual purpose, without notice that the interview would be under oath and transcribed, and without an attorney; damaging Burgess's reputation by publicly making false statements about him; and an additional act referenced herein but not detailed at this time because of potential disclosure limitations.

216.     These acts are sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. Plaintiff reasonably fears that Defendants will engage in further retaliatory acts in the future.

217.     Plaintiff has suffered a diminution of his First Amendment rights, which cannot fully be compensated by money damages.

218.     Plaintiff has suffered and will continue to suffer economic and reputational harm as a result of the Defendants' unconstitutional actions.

219.     Defendants acted under color of state law in retaliating against Plaintiff.

220.     Defendant CBSD is responsible for the unconstitutional retaliation against Plaintiff because the retaliatory actions were taken by a final policy maker.

221.     Further, the retaliatory actions taken against Plaintiff were undertaken as part of a broader policy of CBSD and ratified by the Board.

## COUNT II

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* against Defendant Central Bucks School District**

222.     Plaintiff realleges and incorporates the facts and allegations contained in all prior paragraphs as if fully set forth herein.

223.     Defendant CBSD retaliated against Burgess for engaging in statutorily protected activity, including but not limited to, advocating for LGBTQ+ students on multiple occasions, filing and getting involved in complaints of sex discrimination with OCR, and filing this federal lawsuit.

224.     Defendants' retaliatory acts include suspending Plaintiff from teaching, twice; placing him under investigation, twice; involuntarily transferring him to a different position; subjecting him to a four-hour interview without notice of the actual purpose, without notice that the interview would be under oath and transcribed, and without an attorney; damaging Burgess's reputation by publicly making false statements about him; and an additional act referenced herein but not detailed at this time because of potential disclosure limitations.

225.     Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

226.     Retaliation for reporting discrimination based on sex is sex-based discrimination under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

227.     As a federal funding recipient, Defendant CBSD is subject to Title IX's prohibitions on sex- and gender-based discrimination.

## COUNT III

**Violation of 42 U.S.C. § 1983**
**Based on Deprivation of Plaintiff's Right to Procedural Due Process under the Fourteenth Amendment to the United States Constitution against Defendant Central Bucks School District**

228.     Plaintiff realleges and incorporates the facts and allegations contained in all prior paragraphs as if fully set forth herein.

229.     Defendant CBSD publicly made false statements about Burgess that stigmatized his reputation in the course of suspending him from teaching.

230.     Under 24 P.S. § 11-1124 and the collective bargaining agreement between CBSD and the Central Bucks Education Association, Plaintiff has a property interest in not being suspended without just cause.

231.     Defendant CBSD's public, false statements about Plaintiff, combined with CBSD's second suspension of Plaintiff, deprived Plaintiff of his liberty interest in reputation.

232.     Plaintiff is entitled to due process, including notice and an opportunity to be heard, before being deprived of his liberty interest in reputation.

233.     Defendant CBSD did not provide Plaintiff with notice or opportunity to be heard prior to publicizing false statements detrimental to Plaintiff's reputation and suspending Plaintiff.

234.    As a result, Defendant CBSD has deprived Plaintiff of his liberty interest in reputation, in violation of Plaintiff's right to procedural due process under the Fourteenth Amendment to the United States Constitution.

## COUNT IV

**Violation of Pennsylvania Constitution**
**Based on Deprivation of Plaintiff's Right to Procedural Due Process under the**
**Pennsylvania Constitution against Defendant Central Bucks School District**

235.    Plaintiff realleges and incorporates the facts and allegations contained in all prior paragraphs as fully set forth herein.

236.    Plaintiff has a fundamental right to protect his reputation under the Pennsylvania Constitution, Article I, §§ 1 and 11.

237.    Plaintiff is entitled to due process, including notice and an opportunity to be heard, before being deprived of his right to reputation.

238.    Defendant CBSD did not provide Plaintiff with notice or opportunity to be heard prior to publicizing allegations detrimental to Plaintiff's reputation.

239.    As a result, Defendant CBSD has deprived Plaintiff of his fundamental right to reputation, in violation of his right to procedural due process under the Pennsylvania Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Andrew Burgess respectfully requests that the Court:

(a)    enter a declaratory judgment that Defendants' actions complained of herein are in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., the First and Fourteenth Amendments to the United States Constitution, and the Pennsylvania Constitution;

(b)    issue a permanent injunction restoring Plaintiff Burgess to the eighth-grade social studies position at Lenape Middle School; removing the "Discharge Warning" and

any reference to his suspension from his personnel file; ceasing dissemination of recordings of the presentation of the Internal Investigation Report as Requested by the Central Bucks School District at the April 20, 2023, special school board meeting; ceasing dissemination of the Internal Investigation Report as Requested by the Central Bucks School District; remediating other adverse actions taken against Burgess; and prohibiting further retaliatory actions against Burgess;

(c)    order all compensatory relief necessary to cure the adverse effects of Defendants' unconstitutional actions on Plaintiff, and/or nominal damages;

(d)    award Plaintiff punitive damages against Defendant Lucabaugh in his individual capacity;

(e)    award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(f)    order such other relief as this Court deems just and equitable.

Respectfully submitted,

August 14, 2023                **ACLU OF PENNSYLVANIA**

/s/  *Witold J. Walczak*
Witold J. Walczak (PA ID 62976)
Richard Ting (PA ID 200438)
P.O. Box 23058
Pittsburgh, PA 15222
412.681.7864
vwalczak@aclupa.org
rting@aclupa.org

**SETH KREIMER, ESQUIRE**
(PA ID 26102)
3501 Sansom Street
Philadelphia, PA 19104
215.898.7447

skreimer@upenn.edu

*Attorneys for Andrew Burgess*